**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **Gregory S. Parks, J.D., Ph.D.,** | ) | |
| **derivatively on behalf of Alpha Phi** | ) | |
| **Alpha Fraternity, Incorporated,** | ) | |
| **411 S. Marshall Street, #202** | ) | |
| **Winston Salem, NC 27101** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Willis L. Lonzer, III** | ) | |
| **6935 S Chappel Ave** | ) | |
| **Chicago, IL 60649-1514** | ) | |
| | ) | **Case No:** |
| **Lucien J. Metellus, Jr.** | ) | |
| **105 McClellan Drive** (Frederick County, MD) | ) | |
| **Frederick, MD 21702** | ) | |
| | ) | |
| **Jeramaine O. Netherly** | ) | |
| **15230 Bedford Glen Dr** | ) | |
| **Channelview, TX 77530** | ) | |
| | ) | |
| **Daryl D. Parks** | ) | |
| **540 Gore Ave.** | ) | |
| **Tallahassee, FL 32310** | ) | |
| | ) | |
| **Wayne C. Harvey** | ) | |
| **11932 Moorland Manor Ct.** | ) | |
| **Saint Louis, MO 63146** | ) | |
| | ) | |
| **Denny N. Johnson** | ) | |
| **4112 Lavender Lane** (Prince George's County, MD) | ) | |
| **Bowie, MD 20720-4284** | ) | |
| | ) | |
| **Cecil E. Howard** | ) | |
| **11804 Cross Vine Drive** | ) | |
| **Riverview, FL 33579** | ) | |
| | ) | |
| *Defendants* | ) | |
| | ) | |
| | ) | |
| **and** | ) | |
| | ) | |

1

**Alpha Phi Alpha Fraternity,**        )
**Incorporated**        )
**2313 St. Paul Street**  (Baltimore City, Maryland)   )
**Baltimore, MD 21218**        )
        )
         ***Nominal Defendant.***        )

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff, Gregory S. Parks, J.D., Ph.D. ("Plaintiff" or "Dr. Parks"), by undersigned counsel, submits this Verified Derivative Complaint (the "Complaint") on behalf of Nominal Defendant, Alpha Phi Alpha Fraternity, Incorporated ("the Fraternity"), against Defendants Willis L. Lonzer, III; Lucien J. Metellus, Jr.; Jeramaine O. Netherly; Daryl D. Parks, Esq.; Wayne C. Harvey, Esq.; Denny N. Johnson; and Cecil E. Howard (collectively, "Defendants").

## NATURE OF THE ACTION

1. This derivative action is brought on behalf of Alpha Phi Alpha Fraternity, Incorporated, whose senior fiduciaries placed their own personal interests in retaining power above the Fraternity's welfare.

2. For more than a decade, Plaintiff has used his position as a scholar and Fraternity member to identify governance, compliance, risk-management, and member-safety problems facing the organization and to propose evidence-based solutions to them. Yet the Board and the Defendants have repeatedly ignored, suppressed, or retaliated against those efforts — refusing to investigate documented misconduct, tolerating retaliation against good-faith reporters, and prioritizing the personal and political interests of incumbent leadership over the Fraternity's institutional welfare.

2

3.      Plaintiff seeks to remedy a pattern of institutional harm to the Fraternity caused by Defendants' sustained failure to comply with law, safeguard the Fraternity's assets, enforce its governing documents, and protect the integrity of its governance.

4.      First, Defendants exposed the Fraternity and its subordinate units to substantial tax and compliance risk. Despite notice since at least 2018 that the Fraternity lacked a group exemption and that most subordinate units were not tax-exempt, Defendants failed to quantify or remediate the resulting back-tax exposure and later directed subordinate units to file 990 forms without first addressing accumulated tax liabilities, penalties, or voluntary-disclosure options.

5.      Second, Defendants failed for years to investigate, remediate, or implement systematic safeguards in response to repeated reports of hazing and sexually predatory conduct. Those failures have exposed the Fraternity to increased risk of uninsured or underinsured liability, increased insurance premiums, substantial litigation costs and settlements, and damaged relationships with members, candidates for membership, universities, and other institutional stakeholders.

6.      Third, Defendants corrupted the Fraternity's Thirty-Seventh General Presidential Election through prohibited campaigning, defamatory falsehoods, concealment of material information about candidates, unequal enforcement of election rules, staff involvement in campaign activity, and unresolved ballot and data irregularities—culminating in the installation of leadership through a process the Fraternity could not trust as fair, transparent, or rule-compliant, and depriving the Fraternity of leadership selected through the legitimate democratic process guaranteed by its governing documents.

7.      Fourth, Defendants depleted or misused Fraternity assets through related acts of self-interest and noncompliance, including the unauthorized 2024 Chicago "Constitutional

Convention" costing approximately $750,000, the shielding of the Southern Region's approximately $250,000 deficit from investigation, and Defendant Daryl Parks's apparent use of Fraternity membership data and communications channels for personal political purposes.

8.      Fifth, the Metellus Administration has sought to promulgate new election rules that would insulate fiduciaries from accountability for election interference, channel election disputes into non-public processes, and withhold transparent disclosure to the membership about fiduciary obligations owed by officers and directors.

9.      The remedies sought—tax and compliance remediation, independent investigation, structural governance reforms, monetary relief replenishing the Fraternity's treasury, declaratory relief voiding ultra vires acts and the tainted election, and injunctive relief restoring governance integrity—redound exclusively to the benefit of the Fraternity and its membership, not to Plaintiff individually.

10.      Plaintiff does not assert any direct-action claims, does not seek personal damages, and will not seek the General Presidency in any new election ordered as relief.

11.      Plaintiff brings this action only after exhausting all internal remedies over a two-year period, during which the Fraternity's General Board of Directors (the "Board") refused two written demands, demonstrating that the Board is incapable of exercising the independent, disinterested judgment necessary to cause the Fraternity to act in its own interest.

## PARTIES

12.      Plaintiff Gregory S. Parks, J.D., Ph.D. is a citizen of the State of North Carolina. Plaintiff was duly initiated into the Fraternity on March 22, 2007, has been a Life Member since February 11, 2013, and has remained a member of the Fraternity continuously at all times relevant

hereto. Plaintiff is a member of the bars of Maryland and the District of Columbia and is a tenured law professor.

13.    Defendant Willis L. Lonzer, III, Ph.D. ("Lonzer") is a citizen of the State of Illinois. Lonzer served as Midwestern Regional Vice President from 2017 to 2020 and as the Thirty-Sixth General President from January 2021 to January 2025. Lonzer is a current member of the Board.

14.    Defendant Lucien J. Metellus, Jr. ("Metellus") is a citizen of the State of Maryland. Metellus served as Eastern Regional Vice President from 2017 to 2021 and was announced the winner of the Thirty-Seventh General Presidential race in 2024, assuming office in January 2025. He is the current General President and Chairman of the Board.

15.    Defendant Cecil E. Howard, Esq. ("Howard") is, upon information and belief, a citizen of the State of Florida. Howard served as the Southern Regional Vice President from 2022 to 2025 and was a member of the Board during the same period. He also serves as the Associate Provost for Academic Programs and Interim Dean of the College of Law at Florida A&M University.

16.    Defendant Jeramaine O. Netherly ("Netherly") is, upon information and belief, a citizen of the State of Texas. Netherly served as the Southwestern Regional Vice President from 2022 to 2025 and was a member of the Board during the same period.

17.    Defendant Daryl D. Parks, Esq. ("Daryl Parks") is a citizen of the State of Florida. Daryl Parks was appointed General Counsel to the Fraternity in or about 2017 and continued to act, and be held out, as General Counsel through 2024. The position of General Counsel is subject to a four-year term limit under Article IV § 4.3 of the Constitution. After his authorized four-year term expired in or about 2021, Daryl Parks continued to exercise the powers and prerogatives of General Counsel without lawful authority to do so, serving for more than three years beyond the

constitutional limit. Daryl Parks is currently running for the position of Mayor of Tallahassee, Florida.

18.     Defendant Wayne C. Harvey, Esq. ("Harvey") is, upon information and belief, a citizen of the State of Missouri. Harvey was appointed General Counsel to the Fraternity in or about January 2025 under the Metellus Administration and currently occupies that role.

19.      Defendant Denny N. Johnson ("Johnson") is a citizen of the State of Maryland. Johnson has served as Assistant Executive Director of the Fraternity since December 2015. As set forth more fully herein, the functions and powers he exercises under color and claim of authority rendered him a de facto officer of the Fraternity for purposes of the fiduciary duties pleaded herein.

20.     Nominal Defendant Alpha Phi Alpha Fraternity, Incorporated ("the Fraternity") is a corporation registered to do business in Maryland, having represented to the State of Maryland that it is an Illinois corporation, with its principal place of business at 2313 St. Paul Street, Baltimore, Maryland 21218. The Fraternity is named as a nominal defendant because the claims asserted herein are derivative in nature and any recovery will inure to its benefit.

21.     Defendants Daryl Parks, Howard, Netherly, and Johnson each received reportable compensation from the Fraternity beyond reimbursement of actual expenses during the relevant period. Upon information and belief, Defendant Harvey likewise receives compensation for his service as General Counsel.

22.     Defendants also derived personal perks and benefits from their offices beyond cash compensation, including budgeted travel, lodging, and meal coverage for senior leaders at Fraternity events, and—given the Fraternity's national prestige and brand—the intangible emoluments of office (power, position, and prestige) that conferred collateral advantages outside

the organization, such as enhanced professional visibility, networking access, and related opportunities they would not have enjoyed but for their Fraternity positions.

## JURISDICTION AND VENUE

23.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because (a) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; and (b) complete diversity of citizenship exists between Plaintiff and Defendants as aligned in this action.

24.    The Fraternity is properly aligned as a Nominal Defendant because its management is antagonistic to Plaintiff's claims. The persons who control the Fraternity's litigation decisions have approved, participated in, and/or refused to remedy the wrongful conduct challenged in this action and have a direct personal interest in opposing the prosecution of these claims.

25.    This Court has personal jurisdiction over the Fraternity because it maintains its principal place of business in Baltimore, Maryland.

26.    This Court has personal jurisdiction over Defendants Metellus and Johnson because each is domiciled in Maryland.

27.    This Court has specific personal jurisdiction over each non-Maryland Defendant because each: (a) served as a Director, Officer (de jure or de facto) of the Fraternity during the relevant period; (b) purposefully directed conduct giving rise to the claims asserted herein with knowledge that the Fraternity's principal place of business is in Maryland; and (c) caused, or reasonably should have expected to cause, injury to the Fraternity in Maryland. Md. Code Ann., Cts. & Jud. Proc. § 6-103(b).

28.    This Court also has personal jurisdiction over each non-Maryland Defendant under a conspiracy theory of jurisdiction because each knowingly participated in a common scheme to

7

conceal fiduciary misconduct and obstruct investigation of derivative harms, which included overt acts directed to and occurring in Maryland, with the foreseeable result that injury accrued to the Fraternity in Maryland, where it maintains its principal place of business.

29.    Venue is proper under 28 U.S.C. § 1391(b) because: (a) the Fraternity maintains its principal place of business in this District; (b) one or more Defendants reside in this District; and (c) a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.    The Fraternity's Governance Framework And Sources Of Duty.

#### a.  *Institutional Legacy.*

30.    The Fraternity is the oldest continuous intercollegiate Greek-letter organization founded by African Americans, having been first chartered at Cornell University in 1906.

31.    The Fraternity emerged from the traditions of African American churches, African American benevolent and secret societies, collegiate fraternal life, and the Nadir of American race relations. These founding traditions supply the historical context for the corporate purposes that set the outer boundary of the Fraternity's lawful authority.

32.    The Fraternity coalesces "[a]ll the noble, the true and courageous."

33.    Fraternity members past and present include United States Vice President Hubert H. Humphrey, United States Supreme Court Justice Thurgood Marshall, Dr. Martin Luther King, Jr., and other persons of national distinction. The Fraternity's reputation and its membership rolls are corporate assets with concrete economic value: they drive member retention, recruitment, chapter placement on college campuses, community partnerships, and fundraising.

34.    The Fraternity's governance framework is defined by an integrated set of governing documents, including its: (a) Articles of Incorporation; (b) Constitution and By-Laws; (c) Board

Governance Manual; (d) Official Membership Policy and Procedures Manual (the "Membership Manual"); (e) Handbook on Protocol and Procedures for the Election of General Officers (the "Election Handbook"); and (f) Whistleblower Policy (collectively, the "Governing Documents"). Together, these documents establish a binding contractual and legal framework governing the rights and obligations of the Fraternity, its members, and its fiduciaries.

### b. *Governing Documents.*

35.     The Fraternity's Articles of Incorporation, dated April 2, 1912, authorize the corporation to exist for the "particular purpose and object . . . [of being] educational and for the mutual uplift of its members as expressed in its constitution, and in general to do and perform every lawful act and thing necessary or expedient to be done or performed for the efficient[] conducting of said society."

36.     A true and accurate copy of the Articles of Incorporation is attached hereto as **Exhibit 1**.

37.     The Constitution and By-Laws establish the Fraternity's organizational structure, the composition and duties of the Board, the powers and obligations of General Officers, and the procedures for amending the Fraternity's governing framework.

38.     A true and accurate copy of the Fraternity's Constitution and By-Laws is attached hereto as **Exhibit 2**.

39.     Amendments to the Constitution require submission of proposed changes to the respective Regional Vice President not less than sixty days prior to the next Regional Convention; the Regional Vice President must send copies of all proposed amendments to chapters not less than thirty days prior to the General Convention; and the Executive Director must send copies to each

9

chapter not less than sixty days prior to the General Convention. Const. art. VI, §§ 1.1–1.4. Amendments to the By-Laws follow a parallel process. By-Laws art. XII, §§ 1.1–1.2.

40.     The Board Governance Manual supplements the Constitution and By-Laws by establishing standards of conduct for the Board. It requires Directors to engage in "ethical, business-like, and lawful conduct," including "un-conflicted loyalty to the interests of the Fraternity" and the avoidance of "any conflict of interest to their fiduciary responsibility." Board Governance Manual at 7.

41.     A true and accurate copy of the Board Governance Manual is attached hereto as **Exhibit 3.**

42.     The Membership Manual establishes the Fraternity's investigation and discipline procedures. It requires that when "an allegation and/or incident" suggests a member has violated Fraternity rules, university policy, or the law, the Regional Vice President must immediately issue a Cease and Desist Order and an investigation must be conducted by a Rapid Response Team free from conflicts of interest. The investigation must produce a written report with findings forwarded to the General President, Executive Director, General Counsel, and Regional Vice President. Membership Manual at 66–68.

43.     A true and accurate copy of the Membership Manual is attached hereto as **Exhibit 4**.

44.     The Election Handbook governs the procedures for elections to the Board, including the General Presidency. Election procedures must "be prescribed by the Standing Committee on Elections" and be consistent with the Constitution. Const. art. IV, § 3.1.

45.     For the office of General President, the official campaign begins at the notification certification date; candidates must "refrain from starting official campaigning until the certification

has been completed"; and any candidate found campaigning early "MAY BE SUBJECT TO IMMEDIATE DISQUALIFICATION." Election Handbook at 11. General Office staff are "prohibited from assisting any of the candidates in their individual campaigns." Election Handbook at 7.

46.    A true and accurate copy of the Election Handbook is attached hereto as **Exhibit 5.**

47.    The Whistleblower Policy is intended "to encourage and enable directors, volunteers, and employees to raise Concerns within Alpha for investigation and appropriate action." It provides that no person who in good faith reports a concern "shall be subject to retaliation or, in the case of an employee, adverse employment consequences." Any member or employee who retaliates against a good-faith reporter "is subject to discipline up to and including dismissal from the Fraternity or termination of employment." Whistleblower Policy at 1.

48.    A true and accurate copy of the Whistleblower Policy is attached hereto as **Exhibit 6** and incorporated herein by reference.

49.    In addition to its written Governing Documents, the Fraternity is bound by longstanding customs and practices that are uniform, reasonable, generally known and acquiesced in by the membership, that are consistent with the Governing Documents and have been observed and abided uninterrupted for decades.

### c.  *Governance Structure.*

50.    The General Convention, held biennially, is the Fraternity's supreme governing authority. Const. art. II, § 2.1. The General Convention has "the sole power to enact legislation for the regulation of all matters pertaining to the General Organization." Const. art. II, § 2.2.

51.    Between General Conventions, the Board manages the Fraternity's affairs.

11

52.     The Board is vested with the authority, and corresponding obligation, to "take such action between sessions of the General Convention as will most effectively ensure the financial integrity and best interests of the Fraternity." Const. art. V, § 2.4.

53.     The Board has fourteen voting members: the General President, the Immediate Past General President, the General Treasurer, the General Comptroller, five Regional Vice Presidents, and five Regional Assistant Vice Presidents. Const. art. V, § 1.2.

54.     The General President exercises executive authority over the Fraternity's operations, staff, and finances between Conventions. The General President appoints the General Counsel and other appointed General Officers. By-Laws art. III, § 1.

55.     The General Counsel is an appointed officer who serves as "legal advisor to the General Officers" and renders opinions at their request. By-Laws art. III, § 1.1.2. The General Counsel's term is four years. Const. art. IV, § 4.3. The General Counsel, with Board approval, has "the sole authority to prosecute, defend, negotiate and settle all legal actions filed by, on behalf of, against, or in the name of" the Fraternity. By-Laws art. III, § 1.2.

56.     The Fraternity's governance framework creates overlapping and mutually reinforcing sources of duty: (a) contractual obligations arising from the Governing Documents; (b) fiduciary obligations imposed by statutory and common law; and (c) accepted and adopted organizational norms, customs, and practices. Together, these sources impose binding obligations designed to preserve the integrity of the Fraternity's governance, protect its financial and reputational assets, ensure transparency and ethical conduct, and require the organization to act consistently with its chartered mission and the legitimate expectations of its membership.

12

**II.    Noncompliance With Tax Law And The Board's Knowing Failure To Act.**

57.    The Fraternity operates through hundreds of subordinate units—regional offices, district conferences, and local chapters—spread across the country.

58.    Under IRS rules, a national tax-exempt organization may obtain a "group exemption" covering its subordinate units, so that each unit does not need to file a separate application for tax-exempt status.

59.    The Fraternity does not have, and has never had, a group tax-exemption pursuant to 26 C.F.R. § 601.201. Unless its subordinate units individually secured tax-exempt status, they are and have long been taxable entities subject to the corporate tax rate.

60.    According to the IRS database of tax-exempt organizations, none of the Fraternity's regions, districts, or areas are recognized as tax-exempt entities, and only approximately 3.75% of chapters are recognized as tax-exempt.

61.    Without recognized tax-exempt status, the Fraternity's subordinate units have for decades operated as taxable entities subject to the corporate tax rate but have not filed corporate returns or paid corporate tax.

62.    The resulting back-tax exposure, with statutory interest and penalties, is material to the Fraternity and to its subordinate-unit officers personally. Upon information and belief, the Board has never quantified this exposure, never disclosed it to chapter officers, and never sought a voluntary disclosure or compliance agreement with the IRS.

63.    The Board has been on actual notice of the tax compliance problem since at least March 2018, when Plaintiff prepared and shared with the Fraternity's membership a memorandum identifying the Fraternity's failure to obtain a group tax exemption for its subordinate units, the

resulting back-tax exposure for hundreds of chapters and other subordinate units, and the steps necessary to remediate that exposure.

64.     In March 2018, the Fraternity's Chief Financial Officer, Carla Gaskins, contacted the IRS to inquire about the tax status of these units. The IRS agent who spoke with Ms. Gaskins conveyed that: (1) subordinate units are not automatically considered nonprofits under the Fraternity's group designation; (2) each subordinate unit must individually obtain tax-exempt status from the IRS; and (3) units that are not exempt must file applicable tax returns at the corporate rate.

65.     The Fraternity's Chief Financial Officer relayed these findings to the administration in a March 22, 2018 email.

66.     A true and accurate copy of the March 22, 2018 email is attached hereto as **Exhibit 7**.

67.     The Board—including then-Midwestern Regional Vice President Lonzer and then-Eastern Regional Vice President Metellus—took no action.

68.     In 2021, Plaintiff re-issued an updated version of his tax memorandum ("Tax Memorandum"). Afterwards, General Counsel Daryl Parks contacted Plaintiff for a referral to an attorney to address the tax compliance issue. Plaintiff provided a referral and shared the same with no less than five sitting or incoming members of the Board, including then-Eastern Regional Vice President Metellus, but no action followed.

69.     A true and accurate copy of the Tax Memorandum is attached hereto as **Exhibit 8**.

70.     General Comptroller Donald Jackson confirmed to Plaintiff in the fall of 2024 that the Board was aware the situation was a financial "ticking timebomb."

14

71. On or about September 23, 2025, the Board, under General President Metellus's authority, directed subordinate units to each secure an Employer Identification Number and file 990 forms with the IRS in 2026, without addressing years of back-taxes and penalties (the "September 2025 Tax Directive").

72. A true and accurate copy of the September 23, 2025 Board Minutes regarding the September 2025 Tax Directive is attached hereto as **Exhibit 9**.

73. On or about November 19, 2025, General Comptroller Wardell Glass, Jr., CPA, presented the "Report of the General Comptroller" to the Board of Directors. The Report addressed, among other things, the Fraternity's tax compliance posture. Upon information and belief, the meeting was attended by non-Board members and may have been accessible via Zoom for brothers to attend virtually.

74. Under the heading "Tax Compliance," the Report states that "General Headquarters files an I.R.S. Form 990 and 990-T independently" using its own Employer Identification Number. The Report makes no reference to the filing status of any subordinate unit.

75. The Report admits that the Fraternity's subordinate units operate as independent entities whose finances are not consolidated with—and are not reported by—General Headquarters. Yet neither the Report nor any other Board action addressed whether those independently operated units had obtained their own tax-exempt status or were filing their own returns with the IRS.

76. The Report further references the Fraternity's "Global Reporting Implementation Process (GRIP)," a policy adopted in 2015, as the mechanism by which subordinate units would submit financial statements. GRIP, however, was designed solely as an internal management

15

reporting tool and was never intended to ensure compliance with IRS filing requirements.  GRIP reports were marked "UNAUDITED For Internal Management Use Only."

77.     The Report also discloses a series of "Alpha University 501(c)(7) Fiscal Reporting" webinars conducted in the fall of 2025.  The first, held on September 9, 2025, addressed "501(c)(7) fiscal reporting, group exemption, and unified 990 forms."  Subsequent webinars addressed "990 requirements for chapter, district, and regional officers" and the distribution of "New G.R.I.P. Excel Templates."

78.     Upon information and belief, neither the webinars nor the Report addressed, referenced, or proposed any plan to remediate the subordinate units' accumulated back-tax liability, statutory penalties, or interest.  The Board's remedial strategy, as reflected in the Comptroller's Report, was limited to instructing subordinate units to begin filing going forward.

79.     A true and accurate copy of the November 19, 2025 Report of the General Comptroller is attached hereto as **Exhibit 10**.

80.     As of November 2025, an IRS database printout confirmed that the vast majority of subordinate units were not recognized as tax-exempt organizations.

81.     A true and accurate copy of the IRS database printout regarding tax-exempt status of subordinate units is attached hereto as **Exhibit 11**.

### III.  The Board's Sustained And Ongoing Failure To Address Hazing And Sexual Predation.

82.     The Fraternity's mission depends on the trust of the men it attracts, the universities that host its chapters, the communities it serves, and the donors and partners who sustain its programs. That trust, in turn, depends on the Fraternity's ability to keep its candidates for membership and members safe.

83.    The Fraternity's Governing Documents require leadership to promptly initiate an investigation when allegations or incidents suggest violations of Fraternity policy or law. *See* Ex. 4, Membership Manual at 66–68.

84.    Notwithstanding these obligations, the Board has failed to investigate, remediate, or implement compliance measures in response to repeated and credible reports of hazing and sexually predatory conduct — failures that have cost the Fraternity lives, millions of dollars, and the institutional credibility on which its chartered mission depends.

85.    In 2014, Plaintiff raised directly with then-serving Directors of the Fraternity the issue of sex workers — including, upon information and belief, underage individuals — being brought to the Fraternity's national conventions. The Directors failed to initiate any investigation, took no responsive action, and requested Plaintiff's silence.

86.    In 2015, during the General Convention in Charlotte, North Carolina, members formally raised concerns with the Board about sexual predatory conduct by members. Upon information and belief, the Board neither initiated any investigation nor took any responsive action.

87.    In the summer of 2018, the Fraternity partnered with HazingPrevention.org (now Hazing Prevention Network) to implement an evidence-based hazing prevention program. Plaintiff was one of the primary trainers. By September 2018, the Fraternity's leadership, including Defendants Metellus, Lonzer, Daryl Parks, and Johnson, had abandoned the partnership.

88.    That same month, Tyler Hilliard, a University of California-Riverside student and candidate for membership, died in connection with alleged hazing. Upon information and belief, settlement costs and attorney's fees in connection with the civil suit brought against the Fraternity by Hilliard's estate totaled almost $3,000,000.

89. In December 2018, D'Angelo Bratton-Bland, the Student Government Association President at Lincoln University-Missouri and a candidate for membership, also died in circumstances a Lincoln University-Missouri Student Affairs assessment attributed to deviations from the Fraternity's membership intake process.

90. During General President Everett B. Ward's[1] Administration (2017-2020), additional complaints were raised with the Board regarding brother-on-brother predatory conduct. At one point, Defendant Metellus informed Plaintiff that about six sexually predatory incidents had been raised in his region within a six-month period.

91. At the 2019 Midwestern Regional Convention, a Midwestern Regional Assistant Vice President noted in a speech in front of hundreds of Regional Convention attendees that "the Lonzer [regional] administration has a sexual predator problem. I know, because I have been one of the victims." Upon information and belief, the Board, which at the time included Defendants Lonzer and Metellus, did not initiate any investigation, take any responsive action, or implement any preventative measures following this statement.

92. In June 2025, the estate of a former Southern Illinois University Carbondale student sued the Fraternity and some of its members, alleging the student committed suicide following prolonged physical and psychological hazing and sexual assault, including at the hands of members of the Fraternity. *See Estate of Lamoree' Moore v. Alpha Kappa Alpha Sorority, Incorporated et al.*, No. 4:25-cv-00936 (E.D. Mo. June 24, 2025).

93. At the 2025 General Convention and subsequent 2026 Regional Conventions, General President Metellus and General Counsel Harvey acknowledged that the Fraternity has a

---

[1] Former General President Everett B. Ward is the Chair for the Alpha Political Action Committee.

sexual predator issue that it needs to address. However, the sole remedial measure adopted to date has been to add sexually predatory conduct to the existing hazing hotline.

94.     The Fraternity's insurance provider, Holmes Murphy, has warned that "[l]iability exposure continues to be one of the biggest challenges facing men's general fraternal organizations" and that "this exposure threatens the continued existence of many organizations." The Fraternity's own general liability policy excludes coverage for any claim arising from a violation of its rules, regulations, and policies governing risk management, so that uninvestigated and unremedied hazing or sexual-predation incidents expose the organization to uninsured liability.

95.     As reported at the 2025 General Convention, settlement costs and attorneys' fees related to hazing have totaled nearly $3,000,000, and the Fraternity's insurance premiums have risen approximately 150%.

96.     Defendants each knew or should have known of repeated reports of hazing and sexually predatory conduct within the Fraternity, yet each failed to take reasonable steps within the scope of his authority to cause the Fraternity to investigate, remediate known risks, protect good-faith reporters, enforce governing policies, or implement safeguards against recurrence. Their sustained inaction has driven insurance premiums to unsustainable levels, generated millions in litigation costs and settlements, jeopardized the Fraternity's relationships with host universities, and degraded its ability to retain members and attract candidates.

## IV.     The Thirty-Sixth General Presidential Election (2017–2020): The Pattern Of Election Interference Begins.

97.     In or about July 2017, Defendant Lonzer, then serving as Midwestern Regional Vice President and as a Board member, began campaigning for the Thirty-Sixth Presidential Election, in violation of the Election Handbook's prohibition on campaigning prior to certification.

98.     In or about Fall 2018, Defendant Lonzer became a certified candidate for the Thirty-Sixth General Presidential Election.

99.     Plaintiff was also a candidate in that election and advanced a platform addressing longstanding governance, risk management, and organizational issues facing the Fraternity, including hazing, social event liability, member retention, and college chapter sustainability, and advocating for stronger internal controls.

100.     Upon information and belief, during the Thirty-Sixth General Presidential Election campaign, Defendant Lonzer used the authority and resources of the Midwestern Region to cultivate political support for his candidacy. Among other things, Lonzer leveraged members and chapters in his region that had been sanctioned, or were sanctionable, for hazing violations by offering, promising, or facilitating leniency on hazing sanctions in exchange for votes and endorsements in his bid for General President.

101.     Upon information and belief, Lonzer also used Midwestern Region financial and organizational resources to cultivate political support, including by causing or facilitating payments, opportunities, or other regional support to members or chapters for goods, services, events, or chapter-related needs in anticipation that those members or chapters would later provide political support, votes, endorsements, or campaign assistance.

102.     Upon information and belief, one such quid pro quo arrangement involved Defendant Wayne C. Harvey, the Fraternity's then-Immediate Past General Counsel, and a Missouri chapter that Harvey had chartered at Missouri University of Science and Technology. That chapter had been suspended for hazing during Lonzer's tenure as Midwestern Regional Vice President. Lonzer agreed to lift, facilitate the lifting of, and otherwise support relief from that

20

suspension in exchange for Harvey's political support and Harvey's recruitment of alumni from that chapter to support Lonzer's candidacy. Harvey thereafter endorsed Lonzer.

103.    Lonzer's campaign also disseminated false narratives about Plaintiff, including the fabricated claim that Plaintiff sought to admit transgender members. These narratives were amplified through both direct communications and surrogates, including individuals acting at the behest of, or aligned with, Defendant Lonzer's campaign.

104.    The Lonzer campaign recruited self-described "henchman" Dr. Ulysses Grant Baldwin[2] and Dr. Travis Martin[3] to attack Fraternity members who criticized Lonzer or opposed his candidacy. Baldwin and Martin had a reputation within the Fraternity of caustic and threatening exchanges with members, including threats of violence, racialized attacks on non-African American members, and mocking the deaths of Fraternity members. Because of this conduct, they were intermittently removed from Fraternity-related Facebook groups. *See* **Exhibit 12**, Facebook Post by Dr. Martin.

105.    During the Thirty-Sixth General Presidential Election, Baldwin, Martin, and Ward Chief of Staff Kevin Jenkins[4] used Fraternity-related Facebook groups and other online forums to push false narratives about Plaintiff, including the claim that Plaintiff intended to open the Fraternity's membership to transgender individuals. As part of that online campaign, Baldwin and Martin created and circulated a graphic depicting a man wearing a dress with the caption "Everybody vs. Parks."

---

[2] Dr. Ulysses Grant Baldwin is the Director of the DBH Program, Cummings Graduate Institute for Behavioral Health Studies.

[3] Dr. Travis Martin is the Associate Dean of Students and Director of Fraternity & Sorority Life at the University of Michigan.

[4] Kevin Jenkins is the Public Outreach and Engagement Advisor for the United States Department of Justice.

106.   The attacks against Plaintiff became so aggressive and persistent that Plaintiff's campaign attorney sent a seven-page letter to the Fraternity's General Counsel and Election Committee Chair warning that the conduct of senior-leadership surrogates was creating liability for the Fraternity.  The Fraternity's leadership took no action in response to Plaintiff's concerns.

107.   A true and accurate copy of the December 27, 2018 letter is attached hereto as **Exhibit 13**.

108.   At the Fraternity's Midwestern Regional Convention in Toronto, approximately $1,000 of Plaintiff's campaign materials—shipped via Federal Express and confirmed delivered to the convention hotel—were signed for by "Joel J.," the only matching guest at the hotel that day being Joel Johnson, Lonzer's campaign manager. The materials were never recovered.

109.   Upon information and belief, Lonzer caused his campaign manager to take possession of Plaintiff's materials to secure an unfair advantage for Lonzer by impeding Plaintiff's ability to communicate with members at the convention.

110.   Plaintiff ultimately finished ten votes shy of being in the top two candidates to reach the final ballot.

111.   After Defendant Lonzer won the Thirty-Sixth General Presidential Election, Plaintiff sought access to election-related records and voting data in order to evaluate the integrity of the electoral process. Then-Eastern Regional Vice President Metellus informed Plaintiff that only the General President was permitted access to those records.

112.   Following his election, Defendant Lonzer, angered by the view among some members that Plaintiff would have been the stronger General President and by Plaintiff's continued efforts to advocate for governance reforms, repeatedly disparaged Plaintiff to Fraternity members and members of the General Board of Directors. Defendant Lonzer stated: "Fuck Gregory Parks"

22

to a former Eastern Regional Vice President, in response to Plaintiff's efforts to create chapter officer training that the Fraternity's leadership had long neglected.

113.    The Thirty-Sixth race thus established the precedent that fiduciary election interference would go uninvestigated and unpunished — a precedent that directly enabled the more extensive and coordinated interference that followed during the Thirty-Seventh General Presidential Election.

**V.      The Corruption Of The Thirty-Seventh General Presidential Election (2022–2024).**

114.    The Thirty-Seventh General Presidential Election was corrupted by coordinated interference from senior Fraternity leadership acting to predetermine its outcome.

115.    The campaign window opened in late 2022, with Plaintiff and Defendant Metellus among the certified candidates.

116.    At the time, Defendants Lonzer, Daryl Parks, Johnson (then Assistant Executive Director), Howard and Netherly occupied positions that gave them substantial influence over the Fraternity's governance. Lonzer, as General President, exercised executive authority over the Fraternity's administration, appointed officers, official communications, and institutional response to governance disputes. Daryl Parks, while continuing to act as General Counsel after expiration of his constitutional term, influenced the Fraternity's legal response to member complaints and demands for investigation. Johnson, as Assistant Executive Director, exercised authority over membership data, election-related communications, and the General Office's interface with the Election Committee and Merriman River Group—an election management service retained by the Fraternity to handle the General presidential election. Howard and Netherly, as a sitting Board members, had authority to demand investigation, corrective action, and accountability.

117.    These Defendants had reason to view Plaintiff's candidacy as a threat to their continued influence and insulation from accountability. Plaintiff had a documented record of exposing senior-leadership misconduct, including (a) unauthorized personal expenditures, including payments for dependent care and school tuition for his children, by then–General President Herman "Skip" Mason, Jr.,[5] which led to the removal of Mason from office and his suspension from the Fraternity;[6] (b) sex workers being brought to the Fraternity's conventions; (c) longstanding tax-compliance failures; (d) hazing and sexual-predation risks; and (e) election-integrity issues.

118.    Upon information and belief, these Defendants understood that a Parks administration would likely investigate senior leadership misconduct, disclose it to the membership, limit the informal influence of Past General Presidents, and implement reforms making director and officer accountability more likely.

119.    This motive was confirmed by then-Comptroller Donald Jackson, in a March 2023 text message to Plaintiff, underscoring senior leaders' fears of change, Plaintiff potentially exposing their misconduct, loss of personal perks, and inability to control Plaintiff.

120.    A true and accurate copy of Donald Jackson's text message to Plaintiff is attached hereto as **Exhibit 14**.

---

[5] Former General President Herman "Skip" Mason, Jr. is the Interim President of the Interdenominational Theological Center.

[6] During the Mason episode, General Office staff expressed fear of losing their jobs if they spoke out about the financial improprieties, and in 2013 then-General President Johnson publicly admonished a General Office employee from the stage of the General Convention for raising concerns about leaders' financial improprieties.

121.    Past Executive Director Gregory Phillips, in a separate June 2023 discussion, offered similar reasons: leaders feared their secrets being exposed, being overshadowed, diminished influence within the Fraternity, and a reduction in their personal perks.

122.    Indeed, in March 2026, a member informed Plaintiff that Past General President Ward had personally attempted to dissuade him from supporting Plaintiff in the Thirty-Seventh General Election out of fear that Plaintiff, if elected, would report the Fraternity's tax-compliance problems to the IRS, exposing Ward and his peers for inaction.

123.    Upon information and belief, Lonzer, Parks, Johnson, Howard, and Netherly viewed Candidate Metellus as the preferred alternative to Plaintiff because Metellus had longstanding relationships with them and was amenable to ensuring that their prior and ongoing misconduct would not be disclosed to the membership and that they would retain ongoing influence.

124.    Expanding on the pattern and practice established in the Thirty-Sixth General Presidential Election, Defendants Lonzer, Parks, Johnson, Howard, Netherly, and Metellus interfered with and corrupted the Thirty-Seventh General Election.

   a.  **Election Interference by the Sitting General President – Defendant Lonzer.**

125.    The Fraternity's governing rules and fiduciary standards impose duties that, taken together, require election neutrality by those who hold or have held the General Presidency. *See* Constitution, art. V, § 2.4 (board members are required to act in the Fraternity's best interests); Board Governance Manual (directors are to engage in "ethical, business-like, and lawful conduct"); *see also* Election Handbook (General Office staff "cannot assist any of the candidates in their individual campaigns.").

25

126.    Consistent with these written rules, for decades the Fraternity has observed a well-known and unbroken custom and practice that sitting and past General Presidents do not interfere in General Presidential elections, are precluded from using the powers, prestige, or resources of office to influence the outcome of a General Presidential election.

127.    Throughout the campaign period, Defendant Lonzer acted contrary to the Fraternity's governing rules and customs and his fiduciary obligations by using his position to influence the General Presidential election against Plaintiff.

128.    Defendant Lonzer personally spread false and defamatory narratives regarding Plaintiff's qualifications, personal characteristics, and policy positions to members across the country, enlisted past General Presidents and a network of surrogates to amplify his messaging, and used his control over the General Office's communications infrastructure to suppress voter participation among membership demographics he believed favored Plaintiff.

129.    Beginning in early 2023, Lonzer personally contacted members across the country to spread the claim that Plaintiff was gay and planned to "come out of the closet once elected General President." This claim is false: Plaintiff is and has always been heterosexual.

130.    Lonzer and his surrogates simultaneously spread the false narrative that Plaintiff intended to open the Fraternity's membership to transgender individuals. At no time did Lonzer inform members that Candidate Metellus was, in fact, the only candidate who—either personally or through surrogates—openly advocated admitting transgender members.

131.    Lonzer personally contacted members of Plaintiff's own campaign team and attempted to persuade them to withdraw their support for Plaintiff, using the false sexual-orientation and transgender narratives as leverage.

132.    Lonzer's defamatory campaign produced its intended effect: as one Past Georgia District Director informed Plaintiff, his chapter would not support Plaintiff because of fears Plaintiff would "open the floodgates" to gay members. Other District Directors, District Legal Counsels, and members independently reported the same.

133.    Lonzer also used his State of the Fraternity Address, beginning at the Southern Regional Convention in March 2023 and continuing through every subsequent Regional Convention to imply that Plaintiff was unqualified, stating that the Fraternity needed leaders with "experience" and not those offering "theories." When Plaintiff confronted Lonzer regarding his remarks, Lonzer responded that "he hoped that [Plaintiff] was in the room, because they were intended for [Plaintiff] to hear."

134.    Past General Presidents Harry E. Johnson,[7] Ward, and Mason acting, upon information and belief, at Lonzer's direction or behest, delivered substantively identical remarks at events throughout 2023. At the Southwestern Regional Convention, Past General President Mason, who had been removed from office and suspended from the Fraternity in 2012 after Plaintiff blew the whistle on his abuse of Fraternity funds, declared that one candidate would receive "the karma he deserves." As reported to Plaintiff by past General Board of Directors members, Mason was targeting Plaintiff, as he believed it was Plaintiff's fault that he had been suspended from the Fraternity.

---

[7] Past General President Harry E. Johnson is the current President and CEO of the Washington, D.C. Martin Luther King Memorial Foundation.  Upon information and belief, Past General President Harry E. Johnson believed Plaintiff, if elected as General President, would investigate and uncover additional financial improprieties committed during his administration.

27

135. Lonzer's false narratives were further amplified by a network of surrogates operating on Fraternity-related social media platforms — including Facebook groups and the Fraternity's own platform, Alpha Elite — who proliferated the same messaging about Plaintiff's sexual orientation, transgender-membership position, and qualifications that Lonzer and the Past General Presidents were delivering privately and at official events.

136. Throughout the race, Plaintiff had raised concerns about election interference directly to Defendants Lonzer and Daryl Parks, the Executive Director Sean McCaskill, and Election Committee Chairman Lucious Turner, III.

137. On July 1, 2023, Plaintiff's campaign put Lonzer's election interference in writing before the Election Committee Chairman Turner, stating "It has come to our attention that Bro. Lonzer has been contacting brothers in an effort to undermine Bro. Parks." The Election Committee took no action in response to Plaintiff's petition.

138. By August 2023, the interference had expanded beyond public rhetoric to covert manipulation of the election infrastructure itself.

139. Lonzer used his control over the General Office to suppress voter participation among members he believed would support Plaintiff. In August 2023, Election Committee Chairman Turner informed Plaintiff that Defendant Lonzer was operating a "shadow campaign" against Plaintiff, including by trying to find ways to keep election information such as ballot instructions and voting deadlines from reaching certain members that Defendant Lonzer believed were more likely to vote for Plaintiff.

140. Lonzer also used his control over the General Office to attack Plaintiff. In late September 2023, he authorized non-party Past General President Harry E. Johnson to send a letter on official Fraternity letterhead — from the General Office email account, to the entire

28

membership — that was nominally about a campaign photograph posted by Plaintiff in which Past General President Harry E. Johnson appeared in the background, but spent most of its length arguing that Plaintiff was unqualified.

141.    A true and accurate copy of the non-party Past General President Harry E. Johnson's letter is attached hereto as **Exhibit 15.**

142.    At Lonzer's direction or urging, the Election Committee followed up Past General President Harry E. Johnson's email with its own email to the Fraternity's membership essentially admonishing Plaintiff.

143.    The Election Committee's public response to this minor issue regarding a photograph contrasted sharply with its private and limited response to more serious election-rule concerns involving other candidates, reflecting arbitrary and inconsistent enforcement of the Fraternity's election rules.

144.    For example, Plaintiff filed complaints with the Election Committee reporting Candidate Roderick Smothers, Sr., Ph.D.'s apparent attempts to buy votes at chapter meetings, district conferences, regional leadership conferences, and regional conventions. Candidate Metellus informed Plaintiff that he had filed at least one similar complaint.

145.    The Election Committee responded to Smothers's apparent vote-buying by meeting privately with the candidates and reminding them not to buy votes. Smothers was never publicly identified, reprimanded, disqualified, or subjected to comparable corrective action.

146.    Lonzer also used his personal presence and authority as a sitting General President to influence members directly. At the September 24, 2023 Congressional Black Caucus event, Lonzer personally worked the room, asking individual members how they were leaning in the race.

147.    Upon information and belief, Defendant Lonzer expected personal loyalty from those in his fraternal orbit. In 2023, a then-Lonzer supporter and current Fraternity District Director reported that Defendant Lonzer verbally reprimanded him for stating that Plaintiff was Defendant Lonzer's most formidable opponent, demanding to know where his "loyalties" lie. Defendant Lonzer subsequently trolled that member on social media when he ultimately endorsed Plaintiff.

148.    By October 2023, the election interference had become so flagrant that prominent members across each region wrote to their respective regions exposing it: Past Eastern Regional Vice President Leroy Lowery (a 40-year member) addressed the East; Past Sigma Lambda Chapter (New Orleans, Louisiana) President Joe Ricks, Ph.D. (34-year member) addressed the Southwest; Past Western Region Election Committee Chair Charles Loeb, M.D. (58-year member) addressed the West; and Past Kentucky District Director Lee Jackson (52-year member) addressed the Midwest.

149.    True and accurate copies of the Lowery, Ricks, Loeb, and Jackson emails are attached hereto as **Exhibits 16** through **19**, respectively.

150.    The common theme across all four emails was that Lonzer's and the Past General Presidents' interference was an unprecedented departure from the Fraternity's longstanding custom of presidential neutrality. Each writer independently identified the same pattern: sitting and past General Presidents openly campaigning against Plaintiff at regional events, spreading false narratives, and using the machinery of the General Office to influence the outcome — conduct that had never before occurred in a General Presidential Election.

151.    The Board offered no response. No investigation was initiated, and no corrective action was taken.

152.    During the campaign, Defendant Metellus acknowledged to Plaintiff that past and present senior Fraternity leaders were spreading false narratives about Plaintiff, and that those narratives were influencing how members voted, with much of Metellus's support coming from members who were voting against Plaintiff out of fear and/or hostility rather than for Metellus.

153.    By the time Plaintiff and Metellus became finalists in the Thirty-Seventh General Election, based upon information and belief, multiple Past General Presidents—including Harry E. Johnson and Ward—were providing substantial support behind the scenes in propping up Metellus and his campaign, offering a clothing makeover and financial support.

154.    Upon information and belief, during and after the Thirty-Seventh General Presidential Election, Defendant Metellus was loaned tens of thousands of dollars, and Metellus remained indebted on that obligation for at least eighteen months after he was announced the winner of the Thirty-Seventh General Presidential Election in January 2024. At the 2025 General Convention, during a private, invitation-only gathering, Metellus solicited substantial contributions from Fraternity leaders and members to retire this personal debt. By leveraging the prestige of office and the Convention platform for personal financial relief, Metellus created undisclosed conflicts and the appearance that official access and influence could be exchanged for financial assistance.

b.    **Concealment Of Material Information Regarding Other Candidates.**

155.    During the Thirty-Seventh General Election, Defendants Lonzer, Daryl Parks, Howard, and Netherly concealed from the membership material information regarding other candidates, most notably Candidate Smothers. Candidate Smothers had long carried allegations of and a reputation for questionable romantic and sexual relationships. The Board knew this for years

but took no action and Past General President Harry E. Johnson nevertheless supported Candidate Smothers's bid for General President.

156.    On or about September 30, 2022, a former undergraduate Philander Smith College ("PSC") student informed Plaintiff that Smothers, a past member of the Fraternity's Board and the then-President of PSC, had engaged in an inappropriate relationship with him while he was a seventeen-year-old student and Smothers was President of the College. The former PSC student stated that the relationship had lasted several years, that he had retained counsel, and that he had informed PSC's Board of Trustees chair earlier that month.

157.    In November 2022, the former PSC student informed Southwestern Regional Vice President Netherly of the allegations. Defendant Netherly took no action.

158.    In March 2023, at the Southwestern Regional Convention, Defendant Lonzer received direct notice of the Smothers allegations, yet took no action.

159.    In April 2023, the former PSC student submitted a formal grievance to Defendants Lonzer and Daryl Parks, accompanied by supporting documentary evidence. Then-General Counsel Daryl Parks took no action on the formal grievance.

160.    On April 5, 2023, a past Board member independently submitted a letter to the Board demanding an investigation into the Smothers allegations.

161.    On April 7, 2023, General President Lonzer convened a meeting with Past General Presidents regarding the Smothers matter. That same day, Smothers's counsel issued a cease-and-desist letter to Plaintiff, who had been informed of the past Board member's demand, confirming that the substance of the past Board member's letter had been leaked to Smothers.

162.    Within days, surrogates of Fraternity leadership began disseminating the narrative that Plaintiff was responsible for damaging Smothers's career. Plaintiff submitted a sworn affidavit

32

to the Board denying any involvement in the Smothers matter. The Board did not respond to the affidavit, did not correct the false narrative, and did not investigate.

163. Throughout this period — from November 2022 through May 2023 — Defendants Lonzer, Daryl Parks, Howard, and Netherly each had actual knowledge of serious allegations against a sitting candidate for General President and collectively failed to investigate the matter, to disclose that information to the membership, or to disqualify the candidate. Instead, Defendant Lonzer was, upon information and belief, actively traveling the country to prevent the allegations from becoming public.

164. A true and accurate copy of the Texts Regard Smothers and Lonzer is attached hereto as **Exhibit 20**.

165. In or about May 2023, Smothers resigned as President of PSC and withdrew his candidacy for General President. At no point did the Board disclose to the membership the nature of the allegations that precipitated Smothers's withdrawal.

### c. Prohibited General Office Staff Campaigning And Ballot Irregularities.

166. The Fraternity's internal election processes were further compromised by the direct involvement of General Office personnel, most significantly Defendant Johnson, in campaign activities expressly prohibited by the Fraternity's Election Handbook.

167. Beginning no later than February 2023, Johnson personally campaigned for Defendant Metellus and against Plaintiff by informing members that Plaintiff was unqualified to lead the Fraternity and, later, telephoning members and falsely telling them that Plaintiff was the cause of Smothers losing his job.

168. On June 20, 2023, Plaintiff put the Fraternity on formal written notice of Johnson's conduct, emailing the entire Election Committee, General Counsel Daryl Parks, and Executive

Director Sean McCaskill, stating: "The other day, I received a note that there may be a brother on staff at the General Office not only campaigning for one of the General Presidential candidates but also spreading false and defamatory narratives about me in light of the broader issues with Brother Smothers. I certainly am concerned if I'm being openly campaigned against by a headquarters staffer. My bigger concern, however, is that a staff member may be creating civil liability for Alpha."

169.    A true and accurate copy of the June 20, 2023 email is attached hereto as **Exhibit 21**.

170.    No investigation was ever carried out into the matter, and no corrective action was taken.

171.    General Office staff members who were aware of the election interference declined to come forward out of fear of retaliation.

172.    Johnson's willingness to violate the Election Handbook was rooted in his relationship with and loyalty to Lonzer: during General President Ward's Administration, Johnson had been on the verge of termination for performance issues, and Defendant Lonzer had intervened to save his job.

173.    The full scope of Johnson's conflicted role and election interference was concealed from Plaintiff and his campaign until January 9, 2024 — three days before ballot counting — when the Election Committee disclosed for the first time that Johnson had served throughout the election as the General Office liaison to the Standing Committee on Elections and as the custodian of the membership-data files transmitted to the Fraternity's election vendor, Merriman River Group. That meant a person campaigning for a certain candidate (Defendant Metellus) also controlled the membership data files in administering the election.

34

174. The Election Committee had separately discovered, months earlier, that confidential election information had been leaking to Past General Presidents. Johnson's simultaneous roles — as a campaign operative for Metellus, as the General Office's data liaison to the Election Committee, and as the controller of the membership files used for balloting — placed him at the center of that leak.

175. The following day, Election Committee Chairman Turner confirmed to Plaintiff that the Election Committee had never investigated Plaintiff's June 2023 report. Chairman Turner told Plaintiff that he had raised Defendant Johnson's conduct with Defendant Lonzer, and that Lonzer had said he would "handle it," but that Chairman Turner did not expect Lonzer to act given Lonzer's own involvement in the interference. Chairman Turner further stated that Johnson's conduct, if true, would be sufficient grounds to overturn the election.

176. The balloting process administered through Johnson's data files was plagued by irregularities. The established procedures, communicated by the General Office on October 23, 2023, provided that all eligible members would receive a mailed ballot package from Merriman River Group with the option of voting by mail, electronic ballot, or telephone. Many members never received the mailed ballot packages, and many members' electronic voting credentials were routed to spam folders.

177. Metellus was announced as the winner. Plaintiff's campaign requested from Chairman Turner the more detailed breakdown of the election data that Turner had previously confirmed candidates and nominees were entitled to receive; Turner never responded. When Plaintiff separately contacted Turner to contest the announced result, Turner again did not reply.

**VI.   Plaintiff's 2024 Demand And The Lonzer Administration's Refusal To Investigate.**

178. Following the Thirty-Seventh General Presidential Election, Plaintiff and other members raised detailed and corroborated concerns regarding the foregoing election interference and irregularities.

179. In February 2024, Plaintiff delivered a demand letter which included a detailed 65-page document to the Board, identifying derivative harms to the Fraternity and demanding that the Board: (a) investigate the election irregularities; (b) overturn the tainted election; (c) hold accountable those who participated in the wrongdoing; and (d) implement governance policies to prevent similar conduct in the future.

180. A true and accurate copy of the February 2024 demand letter and attachment is attached hereto as **Exhibit 22**.

181. Plaintiff shared the document with the broader Fraternity membership on March 1, 2024. On the same day, past General President Mason gave a speech at the Southern Regional Convention focused on "sore losers."

182. Rather than advise the Board of its fiduciary obligations and ensure Plaintiff's allegations were promptly and properly investigated, Defendant Daryl Parks engaged in a coordinated effort to chill Plaintiff's good-faith reporting. Defendant Daryl Parks (a) told members at Regional Conventions and other Fraternity gatherings that Plaintiff was "costing the Fraternity money" by raising governance concerns; (b) labeled Plaintiff's February 2024 demand with derogatory characterizations to the Board; and (c) threatened to file a lawsuit against Plaintiff for highlighting Defendant Parks's professional and legal failings in not addressing the election interference and tax-compliance matters. Each of those acts constituted retaliation by the General Counsel against a good-faith reporter in violation of the Fraternity's Whistleblower Policy.

183. Instead of undertaking a legitimate investigative process, Defendant Lonzer exercised control over the Fraternity's response and, upon information and belief, directed efforts toward producing a predetermined outcome that would exonerate his administration and affiliated actors.

184. On or about March 6, 2024, Lonzer sent a member-wide email that: (a) framed the issue as personal to Plaintiff rather than derivative harm to the Fraternity; (b) referred the matter to the Grievances and Discipline Committee, which reports back to Lonzer; and (c) stated that, irrespective of any investigation, the announced election results would remain the same.

185. Lonzer appointed Wayne Harvey to manage the Fraternity's response. Harvey had publicly endorsed Metellus for General President in September 2023 and thereafter was rewarded with the General Counsel appointment by Metellus, compromising his ability to render independent legal advice on the election-related misconduct that produced his appointment.

186. Upon information and belief, Lonzer contacted several senior leaders, including Past General Presidents, expressly stating, "I have found someone who is willing to say that, when it came to the General Presidential election, my administration did nothing wrong."

187. Past Eastern Regional Vice President Ronald Mills declined Lonzer's request to join the review team because he perceived that Lonzer was building a team to provide him with the narrative that he desired rather than the truth.

188. In August 2024, in a parallel effort to prompt Board action, Plaintiff contacted the Fraternity's insurance provider, Holmes Murphy, requesting that the carrier urge the Board to conduct a legitimate independent investigation. Holmes Murphy's Vice President Mick McGill informed Plaintiff that he reached out to Fraternity leadership multiple times but received no response.

189. In September and October 2024, multiple past Regional Vice Presidents, past District Directors, and Alumni Chapters separately wrote to the Board requesting an independent investigation by a reputable law firm with corporate-investigations expertise. Grievance and Discipline Committee Chairman Judge Lewis Nixon likewise advised the Board that it should retain a law firm with a practice in corporate investigations to conduct an internal investigation into the allegations in Plaintiff's demand.

190. Upon information and belief, the Board took no action on any of those requests.

191. In fact, Grievance and Discipline Committee Chairman Nixon later confirmed to Plaintiff that there was never any investigation report produced to Plaintiff because there was never any investigation, to his knowledge.

192. On October 28, 2024, Executive Director Sean McCaskill mailed Plaintiff a three-sentence letter on behalf of the Board. In its entirety, the operative portion of the letter stated: "This communication is in response to your letter received on February 29, 2024. The matter was reviewed and there was no violation of the rules and procedures outlined in the process. The results of the General Presidential Election stand as certified by the General Board of Directors."

193. A true and accurate copy of the McCaskill letter is attached hereto as **Exhibit 23**.

194. The McCaskill letter contains no findings of fact, no analysis, no identification of the investigator, no description of methodology, and no list of witnesses or documents reviewed.

195. Upon information and belief, no genuine investigation had been conducted.

196. Notably, McCaskill lacked independence due to his allegiance to and relationship with Defendant Lonzer. Defendant Lonzer hired McCaskill as Interim Executive Director after McCaskill endorsed him for General President, and then as Executive Director despite the fact that the firm that led the hiring search for the Executive Director position ranked him lowest on all

critical metrics compared to other candidates for the position. Board member and Midwestern Regional Vice President Franklin Stacey, Jr. informed Plaintiff that he had never been privy to the McCaskill letter and did not know any other Board member who was privy to it.

197.   In October 2024, Defendant Netherly told a member that the Grievances and Discipline Committee had reviewed the allegations in Plaintiff's demand and found no wrongdoing. When pressed, however, Netherly admitted that he had not reviewed Plaintiff's demand or other materials and could not explain when or how the Committee had reached any such conclusion. Netherly separately stated that no investigation was warranted because Plaintiff had not provided sufficient evidence — a standard that contradicts the Fraternity's own Governing Documents, which require only that an "allegation and/or incident" be reported to trigger an investigation.

## VII.   Post-Demand Continued Misconduct.

### a.   The Unauthorized 2024 Constitutional Convention.

198.   In July 2024, despite having no constitutional authority to do so, General President Lonzer organized a "Constitutional Convention" in Chicago, Illinois.

199.   There is no affirmative mechanism in the Fraternity's Governing Documents for authorizing a special convention for the consideration of amendments, and the only way to do so would be for delegates to suspend Article VI, Section 1 of the Constitution and Article XII, Section 1 of the By-Laws at a prior, authorized General Convention. The Convention was convened without the predicate suspension of the Constitution's governing amendment procedures.

200.   Further, despite Article VI, Section 1.2 of the Constitution requiring that proposed amendments be sent to chapters not less than thirty days prior to the convention, the only notice provided to Convention delegates of the proposed amendment language was an email sent from

"do-not-reply@apa1906.net" on Saturday, July 6, 2024, at 10:11 p.m. The Convention was gaveled in on Wednesday, July 10, 2024—providing only four days' notice rather than the thirty days required by the Constitution.

201.     A true and accurate copy of the July 6, 2024 do-not-reply email noticing the Chicago Constitutional Convention is attached hereto as **Exhibit 24**.

202.     The unauthorized Constitutional Convention resulted in an approximate $750,000 loss to the Fraternity.

### b.  Defendant Howard's Misconduct.

203.     Upon information and belief, Defendant Howard ran the Southern Region approximately $250,000 into the red during his term in office without providing adequate transparency regarding revenue and expenditures. He pursued a centennial regional convention that his own financial team warned was not financially feasible, requiring a bailout from the Fraternity.

204.     Despite Board members demanding an investigation into Defendant Howard's misconduct, General President Metellus refused to investigate, upon information and belief, at the direction of Past General Presidents Harry E. Johnson and Ward.

205.     During his State of the Fraternity Address at the Fraternity's 2025 General Convention, General President Metellus all but absolved Defendant Howard of any wrongdoing to the thousands of members assembled—without any investigation or report having been conducted and provided to the membership. Howard further concealed from Southern Region members that his handpicked successor for Southern Regional Vice President had been federally charged in 2005/2006 with embezzlement of U.S. property and corruptly impeding an FBI

investigation while a Memphis police officer. *See United States v. Vick*, 2007 WL 1468548 (W.D. Tenn. 2007).

Howard also filed a retaliatory lawsuit against a member who raised governance concerns about his administration of the Southern Region, demonstrating a pattern of using legal process to suppress dissent and silence whistleblowers. *See* Complaint, *Howard v. Hicks*, 4:2025cv00294 (N.D. FL July 13, 2025).

### c. Defendant Daryl Parks's Exploitation Of His Position For Personal Gain.

206.    Defendant Daryl Parks also exploited his position as General Counsel for personal gain.

207.    In 2024, while still holding himself out as the Fraternity's General Counsel, Daryl Parks ran for a seat in the Florida Senate and used Fraternity resources—including the Fraternity's membership email list, telephone directory, and other member-contact information—to solicit support and contributions for his campaign.

208.    In one campaign text message, Defendant Daryl Parks identified himself as "Brother Daryl Parks," stated that he was "run[ning] for Florida Senate," invited recipients to a fundraising reception near Capitol Hill, and provided a campaign-contribution link.

209.    A true and accurate copy of Defendant Daryl Parks's campaign text message is attached hereto as **Exhibit 25**.

210.    Upon information and belief, Daryl Parks obtained the recipients' contact information through his access to Fraternity membership records and communications infrastructure, access he possessed by virtue of his position as General Counsel and/or his relationship with the Fraternity's General Office.

41

211.    Daryl Parks's apparent use of Fraternity membership data and communications infrastructure for a personal partisan campaign diverted corporate assets for private benefit and exposed the Fraternity to legal risk.

**VIII.    Plaintiff's Second Demand And The Metellus Administration's Sham Investigation.**

212.    In the months leading up to his inauguration in January 2025, Defendant Metellus privately acknowledged to various members that Plaintiff's allegations of election interference "could not be denied." Yet he publicly took the position that the Fraternity's rules did not prohibit such conduct, that the law did not apply to how the Fraternity conducts its elections, and that the election interference reflected just one member's concern and did not require broader transparency or investigation.

213.    In February 2025, Plaintiff's counsel sent a second demand letter to Defendant Harvey, raising the broader spectrum of derivative harms—many of which animated and undergirded General President Lonzer, Ward, Mason, and Johnson's efforts to undermine the Fraternity's corporate democratic process--including the unauthorized 2024 Constitutional Convention, the Howard Southern Region deficit, and the failure of IRS compliance.

214.    A true and accurate copy of the February 2025 second demand letter is attached hereto as **Exhibit 26**.

215.    Defendant Harvey did not respond to Plaintiff's second demand. Instead, in April 2025, Harvey advised the Board that, as a "voluntary association," "the law doesn't apply to us" and the Board need only follow the rules written in the governing documents. Harvey instructed the Board to ignore the demand.

216.    In or about April 2025, Defendant Metellus informed Plaintiff that he was willing to conduct an investigation into Plaintiff's demands only if (a) he was allowed to run the

investigation; (b) Plaintiff abandoned his legal representation; (c) Plaintiff acquiesced to the findings; and (d) the parameters of the investigation would not be shared with Plaintiff prior to its initiation.

217. Also in April 2025, Defendants Metellus and Harvey caused Past Florida District Director John D. Ellis, Jr., an attorney who had been serially suspended from the practice of law and was ultimately disbarred, to be appointed as the Board's purported investigator of Plaintiff's allegations. *See* **Exhibits 27**, **28**, **29**, and **30**.

218. After Plaintiff informed Ellis that conducting the investigation would constitute the unauthorized practice of law in Florida, and thus a felony, Ellis recused himself. Upon information and belief, no other counsel has been appointed to investigate Plaintiff's second demand.

219. At no point did Defendant Harvey disclose to the membership the substance of Plaintiff's allegations, the demand letters, or the absence of any investigation. To the contrary, at the Fraternity's summer 2025 General Convention, in his General Counsel report, Harvey represented that no brothers had sued or threatened to sue the Fraternity—a representation that materially misled the membership in light of Plaintiff's pending derivative demands.

220. Between April and September 2025, upon information and belief, General President Metellus made repeated false assurances to intermediaries that an investigation would be conducted.

221. In October 2025, Past Executive Director Willard Hall proposed mediation, representing that Metellus and Harvey had agreed to participate. Plaintiff agreed to all terms. No follow-up occurred on the part of Metellus or Harvey.

222. By December 2025, it was apparent that the Board had refused, for the final time, Plaintiff's two-year course of demands. At no point during that period did the Board appoint an

independent committee, retain independent counsel, or take any action to investigate the substance of Plaintiff's allegations.

## IX.   Continuing Harm, Self-Dealing, and Self-Insulation by Defendants

223.   Upon information and belief, in the 2025 Regional Vice President elections, Defendant Johnson again actively participated in attempts to influence the races in violation of the Fraternity's election rules, including by covertly sharing membership data files with preferred candidates.

224.   Upon information and belief, in or around September 2025, the Metellus Administration proposed revised election rules — sponsored by Defendant Harvey — that impose burdens only on rank-and-file members but contain no provisions addressing duties for directors and officers.

225.   The proposed rules would also require mandatory arbitration of election disputes and would not exempt disputes involving fiduciary misconduct.

226.   The Board submitted the proposed amendments to the membership for a vote without disclosing that directors and officers remain subject to non-waivable fiduciary duties of loyalty, good faith, care, disclosure and candor, and obedience under corporate and common law, and that those duties cannot be eliminated through the organization's governing documents.

227.   The proposed rules are designed to insulate fiduciaries from accountability for the very type of fiduciary election interference alleged in this Complaint and to channel disputes about fiduciary breaches into non-public arbitration.

## DERIVATIVE STANDING, DEMAND, AND FUTILITY

228.   Plaintiff brings this action derivatively pursuant to Federal Rule of Civil Procedure 23.1 on behalf of Nominal Defendant Alpha Phi Alpha Fraternity, Incorporated. Plaintiff was a

44

member of the Fraternity at all times relevant to the conduct complained of and remains a member of the Fraternity as of the filing of this Complaint. Plaintiff fairly and adequately represents the interests of similarly situated members of the Fraternity in enforcing the Fraternity's rights. This action is not a collusive one to confer jurisdiction that this Court would otherwise lack. Plaintiff seeks no individual recovery; every remedy requested inures to the benefit of the Fraternity and its membership as a whole, and Plaintiff has expressly disclaimed any intention to seek any personal damages or relief, including the General Presidency in any new election ordered.

229.    Plaintiff served two written pre-suit demands—the February 2024 demand and the February 2025 demand described above. The Board's response to those demands was a wrongful refusal: a sham "review" by an undisclosed reviewer, the attempted appointment of a disbarred attorney as an "investigator," demonstrably erroneous legal advice that, as a "voluntary association," "the law doesn't apply to us," and ultimate silence. The Board's wrongful refusal of Plaintiff's demands was not a good-faith exercise of business judgment but a deliberate effort to insulate implicated fiduciaries from accountability. Therefore, the demand requirement for this derivative suit is satisfied.

230.    In the alternative, demand on the current Board is excused as futile because particularized facts pleaded herein create a reasonable doubt that (a) a majority of the Board is disinterested and independent or (b) the challenged conduct was the product of a valid exercise of business judgment.

231.    The current Board is composed of, among others, voting members General President Metellus (Chairman); Immediate Past General President Lonzer; the five Regional Vice Presidents (Eastern, Midwestern, Southern, Southwestern, and Western); the five Regional Assistant Vice Presidents (Eastern, Midwestern, Southern, Southwestern, and Western); the

General Comptroller; and the General Treasurer. Wayne Harvey serves as an Officer and General Counsel. A majority of these Board members are interested in the conduct challenged herein, lack the independence necessary to consider this action impartially, face a substantial likelihood of personal liability on the claims asserted herein, or some combination of the foregoing.

232.    The Board did not attempt to cure those conflicts by appointing a special litigation committee or any other committee of disinterested and independent Board members to investigate Plaintiff's demands, retain independent counsel, or determine whether pursuing the Fraternity's claims would be in the Fraternity's best interests. Instead, the Board allowed implicated and conflicted fiduciaries—including Defendants Metellus, Lonzer, Harvey, and Daryl Parks—to control or influence the response to Plaintiff's demands, confirming that the Board's refusal was not the product of an independent or good-faith decision-making process.

233.    **Defendant Metellus.** Demand on Metellus is futile. Metellus is the direct, personal beneficiary of the very Thirty-Seventh General Presidential Election he and his co-Defendants corrupted: he holds the office, the salary, the budget, the perquisites, and the executive authority that the tainted process delivered to him, and he cannot impartially consider a demand to sue himself for the conduct that put him in that office. Metellus privately admitted to Plaintiff and other members during the campaign and inauguration period that the election interference "could not be denied," but publicly took the contrary position that the Fraternity's rules did not prohibit such conduct and that "the law" does not apply to the Fraternity's elections. Knowing the interference was real, Metellus nevertheless (a) appointed Defendant Harvey — his public endorser — as General Counsel to handle the very election misconduct from which both he and Harvey had personally benefited; (b) caused or permitted the appointment of a disbarred attorney as the Board's purported independent investigator of Plaintiff's allegations; (c) made repeated false

46

assurances to intermediaries that an independent investigation was underway when none was; (d) authorized the September 2025 Tax Directive that perpetuated the Fraternity's tax-compliance failure rather than remediating it; (e) refused, despite express demands from Board members, to investigate the approximately $250,000 Southern Region deficit run up by his ally Defendant Howard; and (f) acknowledged the Fraternity's sexual-predator problem while adopting nothing more than a hotline-expansion as a "remedy." Metellus faces a substantial likelihood of personal liability on Counts I, II, IV, V, VI, VII, IX, and X, and cannot impartially consider a demand to investigate or sue himself.

234. **Defendant Lonzer.** Demand on Lonzer is futile. Lonzer continues to serve on the Board as Immediate Past General President, and he is the central architect of much of the misconduct alleged herein. Lonzer (a) orchestrated the election interference that corrupted the Thirty-Seventh General Presidential Election; (b) used the General Office's communications infrastructure to suppress voter participation among members he believed favored Plaintiff; (c) recruited Defendant Harvey, his own preferred candidate's endorser, to manage the post-election "review" of Plaintiff's demand; and (d) convened the unauthorized 2024 Chicago "Constitutional Convention," causing the Fraternity to expend approximately $750,000 of corporate funds for no legitimate purpose. Lonzer faces a substantial likelihood of personal liability on Counts I, II, IV, V, VI, VII, IX, and X, and cannot impartially consider a demand to investigate or sue himself.

235. **Defendant Harvey.** Demand on Harvey is futile. Harvey received the General Counsel appointment in January 2025 as direct consideration for his public September 2023 endorsement of Defendant Metellus during the very election that Plaintiff's demands seek to investigate. As General Counsel, Harvey (a) refused to respond to Plaintiff's February 2025 demand and instead erroneously advised the Board "the law doesn't apply" to the Fraternity and

47

then instructed the Board to ignore the demand; (b) participated in or acquiesced in the appointment of a disbarred attorney to investigate Plaintiff's allegations; (c) sponsored the September 2025 proposed election-rule amendments designed to insulate fiduciaries from accountability for the conduct alleged in this Complaint; and (d) at the 2025 General Convention, falsely represented to the membership in his General Counsel report that no brother had sued or threatened to sue the Fraternity, despite Plaintiff's then-pending derivative demands. Harvey faces a substantial likelihood of personal liability on Counts I, II, IV, V, VI, VII, IX, and X, and cannot impartially consider a demand to investigate or sue himself or his patron.

236.    **Defendant Netherly.** Demand on Netherly is futile. As sitting Southwestern Regional Vice President and Board member during the Thirty-Seventh General Presidential Election, Netherly (a) was personally informed in November 2022, by the former PSC student at the center of the Smothers allegations, of the substance of those allegations and took no action; (b) thereafter affirmatively assisted in concealing the allegations from the Fraternity's membership; (c) in October 2024, represented to a Fraternity member that no investigation of Plaintiff's allegations was warranted, because he provided no evidence. Netherly faces a substantial likelihood of personal liability on Counts I, II, IV, and V, and cannot impartially consider a demand to investigate or sue himself.

237.    **Defendant Howard.** Demand on Howard is futile. Howard (a) caused the Southern Region to run approximately $250,000 in the red during his term as Southern Regional Vice President while failing to provide adequate transparency to Southern Region members regarding revenue and expenditures, and pursued a centennial regional convention his own financial team had warned was not financially feasible, requiring a Fraternity bailout from general corporate funds; (b) successfully resisted, with the assistance of General President Metellus, repeated Board-

48

member demands for an investigation into the Southern Region deficit, ensuring that no investigation, accounting, or accountability would follow; (c) concealed from the Southern Region membership the federal criminal record of his handpicked successor; and (d) filed a retaliatory civil lawsuit against a Fraternity member who had raised governance concerns about his administration of the Southern Region, in direct contravention of the Fraternity's Whistleblower Policy. Howard faces a substantial likelihood of personal liability on Counts I, II, IV, V, and VI, and cannot impartially consider a demand to investigate or sue himself.

238.    **Defendant Daryl Parks.**    Demand on Daryl Parks is futile. Daryl Parks (a) continued to occupy, hold himself out as, and exercise the powers of General Counsel for more than three years beyond the four-year term limit — his every act in that office during the post-2021 period being unauthorized and ultra vires; (b) had actual knowledge from at least April 2023 of the formal grievance against Candidate Smothers, yet took no investigative action and suppressed material information from the Fraternity's members during a General Presidential Election; (c) labeled Plaintiff's February 2024 demand with derogatory characterizations, and threatened to file a personal lawsuit against Plaintiff, in violation of the Fraternity's Whistleblower Policy; (d) diverted the Fraternity's corporate assets to support his personal 2024 campaign for the Florida Senate; and (e) failed for years to address the Fraternity's subordinate-unit tax-compliance crisis. Daryl Parks faces a substantial likelihood of personal liability on Counts I, II, IV, V, VI, VII, IX, and X, and cannot impartially consider a demand to investigate or sue himself.

239.    **Defendant Johnson.** Demand on Johnson is futile. Johnson (a) personally illegally campaigned for Defendant Metellus and against Plaintiff during the Thirty-Seventh General Presidential Election; (b) upon information and belief, manipulated the Thirty-Seventh General Presidential Election in operational ways that were concealed from Plaintiff and his campaign; (c)

was identified by the Election Committee Chairman as the apparent conduit through whom confidential election information was leaked to Past General Presidents during the campaign; (d) continued substantially identical conduct in the 2025 Regional Vice President elections; and (e) retained his General Office position only because Defendant Lonzer intervened to save Johnson's job, making Johnson personally dependent on the goodwill of the very fiduciaries his truthful testimony would implicate. Johnson faces a substantial likelihood of personal liability on Counts I (or, in the alternative, III), II, IV, V, and VII, and cannot impartially consider a demand to investigate or sue himself or his patron.

240. **The remaining current members of the Board** have acquiesced in or ratified the Board's refusal to investigate Plaintiff's demands and the Board's issuance of the October 28, 2024 sham "review" letter. They have refused to file any action to recover from the Defendants who participated in the wrongdoing, despite known and quantifiable harm to the Fraternity.

241. **Structural inadequacy of internal review.** Demand is also futile because the Fraternity's own grievance architecture vests investigative authority in the very fiduciaries implicated by Plaintiff's allegations. Under the Fraternity's procedures, only Board members may initiate accusations against another Board member; all such accusations must be reviewed by the General Counsel (himself a Defendant); and the three-member investigating panel is appointed by the General President (also a Defendant). The Board has demonstrated, through repeated inaction across the two-year demand period and the conflicted handling described above, that this structural conflict has operated precisely as designed: investigations were avoided, conflicted individuals controlled every stage of any purported response, and the Board's refusal to act was not an isolated failure but the predictable consequence of a governance architecture that insulates fiduciaries from accountability.

242. A sitting member of the Board, Franklin Stacey, Jr. (current Midwestern RVP), has urged Plaintiff to "sue these [brothers]" because the organization is "so dysfunctional" that it "will not do right unless a court forces us to."

243. Moreover, former Board members have expressed willingness to testify only under subpoena, fearing retaliation. These acknowledgments by Board members confirm that the Board's internal mechanisms for self-correction have been rendered inoperative, that the Board has actual knowledge of its systemic governance failures, and that the Board has consciously disregarded its oversight obligations.

244. Rather than investigate Plaintiff's demands as the Fraternity's Membership Manual requires, the Metellus Administration branded Plaintiff a "sore loser" and recast his governance concerns as a personal grievance—a material misrepresentation to the membership calculated to discredit substantiated whistleblower allegations and further demonstrating the Board's practice of dismissing legitimate governance concerns rather than investigating them.

245. The Defendants' conduct is not protected by the business judgment rule, which does not insulate decisions made in bad faith, for an improper purpose, in conscious disregard of known legal obligations, or by directors who are personally interested in the transaction. The acts complained of are also incapable of ratification.

246. For each of the foregoing reasons, individually and collectively, the Board cannot impartially or disinterestedly consider this action. Accordingly, the demand requirement of Federal Rule of Civil Procedure 23.1 is satisfied by the Board's wrongful refusal of Plaintiff's two demands and is, in the alternative, excused as futile.

## COUNT I
### Breach of Fiduciary Duty
*(Against all Defendants)*

247. Plaintiff incorporates by reference each of the foregoing paragraphs concerning Defendants' fiduciary roles, misconduct, refusal to investigate, concealment, and retaliation, and resulting harm.

248. In their capacity as Directors and Officers of the Fraternity, Defendants Lonzer, Metellus, Howard, Netherly, Daryl Parks, and Harvey each owed fiduciary duties of care, loyalty, good faith, candor and disclosure, and obedience to the Fraternity.

249. Defendant Johnson, although nominally an Assistant Executive Director rather than a General Officer, owed the same fiduciary duties as a de facto officer and agent of the Fraternity by virtue of the discretionary authority he exercised over corporate functions ordinarily reserved for Officers, with the knowledge and acquiescence of Defendant Lonzer in his capacity as then-General President and Defendant Metellus as General President. In doing so, Johnson acted under color and claim of authority of the Fraternity.

250. Each Defendant was required to, at minimum: (a) act in the best interests of the Fraternity; (b) place the interests of the Fraternity and its members ahead of personal, factional, or political interests; (c) ensure compliance with applicable law and the Fraternity's Governing Documents and longstanding governance customs; (d) establish and maintain reasonable systems of internal control and respond appropriately to reports of misconduct; and (e) deal honestly with the membership and refrain from material misstatements or omissions, particularly when the membership was being asked to vote.

251. Each Defendant breached one or more of the foregoing duties through the conduct alleged in detail in the preceding paragraphs incorporated by reference. Without limitation, those

breaches encompass: (a) the knowing failure and refusal to remediate the Fraternity's subordinate-unit tax noncompliance and the September 2025 Tax Directive that perpetuated rather than cured that exposure; (b) the failure and refusal to investigate, remediate, or implement safeguards against hazing and sexually predatory conduct; (c) the coordinated corruption of the Thirty-Seventh General Presidential Election through false statements, voter-participation suppression, prohibited campaigning by Past General Presidents and General Office staff, selective enforcement of the Election Handbook, and the deliberate concealment of material information that the members were entitled to consider; (d) the knowing refusal to initiate any genuine investigation into detailed, credible allegations of fiduciary misconduct and the sham "review" process directed by interested fiduciaries; (e) the sustained toleration of, and in some instances personal participation in, retaliation against good-faith reporters in violation of the Whistleblower Policy; and (f) the knowing and deliberate self-interested exploitation of corporate office and diversion of corporate assets, including the unauthorized 2024 Chicago "Constitutional Convention," the Howard Southern Region deficit, and Defendant Daryl Parks's ultra vires service as General Counsel past the constitutional term limit, and his use of Fraternity assets to support a personal political campaign.

252.    Each Defendant actively participated in the wrongful conduct alleged herein and/or exercised substantial control over the corporate functions through which that conduct was carried out.

253.    The conduct alleged herein was willful and wanton in that it reflected an actual intention to cause harm or, at minimum, an utter indifference to or conscious disregard for the Fraternity's rights and property.

254.     As a direct and proximate result of Defendants' breaches of their fiduciary duties, the Fraternity has suffered damages including the corruption of its democratic governance process, the installation of leadership through a tainted election, and the institutional harms described herein. Plaintiff, on behalf of the Fraternity, has no adequate remedy at law and is entitled to declaratory relief voiding the tainted election, injunctive relief ordering a new election conducted under independent oversight and with scrupulous fairness, and such other relief as the Court deems just.

255.     As a direct and proximate result of Defendants' breaches, the Fraternity has suffered damages in excess of $75,000, to be proved at trial, including but not limited to: depletion of corporate treasury through unauthorized expenditures; unaccounted-for regional operating deficits; exposure to federal and state tax liability, interest, and penalties; corruption of the Fraternity's democratic governance process; escalating insurance premiums, litigation costs, and settlement expenses driven by Defendants' failure to address known risks; diversion of corporate resources for personal purposes; and erosion of membership trust, institutional reputation, and organizational capacity.

256.     In addition to compensatory damages, the Fraternity is entitled to equitable relief including disgorgement of all compensation, benefits, and emoluments received by Defendants during the periods of their respective breaches of their fiduciary duties. To the extent Defendants received salary, fees, or other benefits from the Fraternity during periods in which they were engaged in disloyal conduct, they are not entitled to retain those benefits. The Fraternity is further entitled to a constructive trust over benefits obtained by Defendants through their breaches, an accounting from each Defendant, and a surcharge against individual Defendants in the amount of the specific financial harm attributable to their individual conduct.

## COUNT II
### Breach of the Duty of Oversight / Failure of Internal Controls
*(Against all Defendants)*

257.    Plaintiff incorporates by reference each of the foregoing paragraphs regarding Defendants Lonzer, Metellus, Howard, Netherly, Daryl Parks, and Harvey's fiduciary roles, misconduct, refusal to investigate, concealment, and retaliation, and resulting harm to the Fraternity as if fully set forth herein.

258.    In their capacity as Directors and Officers of the Fraternity, Defendants Lonzer, Metellus, Howard, Netherly, Daryl Parks, and Harvey owed a fiduciary duty of oversight requiring them to establish, implement, and monitor reasonable systems of information, reporting, and control sufficient to ensure the Fraternity's compliance with applicable law and its Governing Documents.

259.    Defendant Johnson, although nominally an Assistant Executive Director rather than a General Officer, owed the same fiduciary duties as a de facto officer and agent of the Fraternity by virtue of the discretionary authority he exercised over corporate functions ordinarily reserved for Officers, with the knowledge and acquiescence of Defendant Lonzer in his capacity as then-General President and Defendant Metellus as General President. In doing so, Johnson acted under color and claim of authority of the Fraternity.

260.    Defendants utterly failed to implement or maintain any reasonable system of oversight or internal controls with respect to: (a) compliance with IRS tax-exemption requirements; (b) investigation and prevention of hazing and sexually predatory conduct; (c) election integrity; and (d) whistleblower protection.

261.    Defendants failed to implement systems to ensure compliance with federal and state tax laws, despite being placed on notice that the Fraternity's subordinate units lacked tax-exempt

status and were exposed to substantial tax liabilities and penalties. Defendants had actual notice of the IRS subordinate-unit tax-exemption problem from at least March 2018, yet they took no corrective action for over seven years, ultimately issuing the September 2025 Tax Directive, which compounded rather than remedied the problem.

262.    Defendants further owed an oversight duty to establish and maintain reasonable systems to monitor compliance with the Fraternity's governing framework and to respond appropriately to credible allegations of hazing and sexually predatory conduct.

263.    Defendants had actual notice of repeated election-irregularity complaints and red flags yet failed to act upon such information and failed to implement any controls to ensure election integrity.

264.    Defendants failed to enforce the Fraternity's own Whistleblower Policy, instead acquiescing in and facilitating retaliation against members who raised governance concerns, including against Plaintiff.

265.    The pattern of sustained, conscious disregard for known risks and repeated failures to act on red flags rebuts any application of the business judgment rule. Defendants' inaction was not the product of a good-faith exercise of business judgment but rather a deliberate choice to prioritize self-preservation over the Fraternity's institutional interests.

266.    Defendants' failures allowed election interference, governance corruption, and tax noncompliance to occur and persist, thereby exposing the Fraternity to significant legal, financial, and reputational harm.

267.    As a direct and proximate result of the Defendants' sustained failure of oversight, the Fraternity has suffered damages in excess of $75,000, to be proved at trial, including but not limited to: exposure to federal and state tax liability, interest, and penalties; increased insurance

premiums; litigation costs, settlement expenses, and uninsured or underinsured liability exposure; failure to detect and remediate hazing, sexual-predation, tax, election-integrity, and whistleblower-protection risks; corruption of the Fraternity's governance and election systems; and erosion of institutional trust, reputation, and operational capacity.

**COUNT III**
**Aiding and Abetting Breach of Fiduciary Duty**
*(In the alternative, against all Defendants)*

268. Plaintiff incorporates by reference each of the foregoing paragraphs regarding Defendants' fiduciary breaches, each Defendant's participation in and assistance to the breaches of the other Defendants, and resulting harm to the Fraternity as if fully set forth herein.

269. In the alternative, to the extent any individual Defendant is found not to have owed or directly breached a fiduciary duty to the Fraternity with respect to any particular course of conduct alleged herein, that Defendant aided and abetted the breaches of the remaining Defendants through the knowing and substantial assistance described below.

270. As set forth above, each Defendant breached, or substantially assisted other Defendants in breaching, fiduciary duties owed to the Fraternity through, among other things, election interference, dissemination of false and misleading information, concealment of material facts, refusal to investigate credible allegations of misconduct, and failure to ensure compliance with legal and governance obligations.

271. Each Defendant had actual or constructive knowledge that the other Defendants were engaging in conduct that violated their obligations to the Fraternity, including conduct that corrupted the Fraternity's electoral process, suppressed accountability, and exposed the organization to legal and financial risk.

272.

57

273.    Despite this knowledge, each Defendant provided knowing and substantial assistance to the other Defendants' fiduciary breaches. Without limitation, that assistance included: (a) Defendant Johnson's prohibited campaigning for Defendant Metellus, manipulation of election data, and dissemination of false narratives about Plaintiff; (b) Defendant Lonzer's authorization and facilitation of prohibited campaigning by Past General Presidents and General Office staff, and his recruitment of Defendant Harvey to manage a sham review of Plaintiff's demand; (c) Defendant Harvey's provision of legally erroneous advice designed to shield the other Defendants from accountability, his instruction to the Board to ignore Plaintiff's demands, and his participation in the appointment of a disbarred attorney as a purported investigator; (d) Defendant Daryl Parks's suppression of the Smothers allegations, retaliation against Plaintiff for raising governance concerns, and failure to advise the Board of its fiduciary obligations; (e) Defendant Howard's concealment of material information regarding his handpicked successor's federal criminal record and his resistance to investigation of the Southern Region deficit; (f) Defendant Netherly's failure to act on or report the Smothers allegations despite direct notice and his subsequent misrepresentations that no investigation was warranted; and (g) Defendant Metellus's acknowledgment of election interference coupled with his refusal to investigate, his shielding of Defendant Howard from accountability, and his coordination with Defendant Harvey to appoint a disbarred attorney to forestall a legitimate investigation.

274.    Each Defendant further provided substantial assistance by participating in efforts to obstruct or avoid investigation of fiduciary misconduct, including by discouraging reporting, failing to act on known violations, facilitating sham or nonexistent review processes, and proposing governance amendments designed to insulate fiduciaries from future accountability.

275.    The assistance provided by each Defendant was substantial and a proximate cause of the harm suffered by the Fraternity, including the corruption of its governance processes, the installation of leadership through a tainted election, exposure to tax liability and penalties, depletion of corporate assets, and exposure to financial and legal liabilities.

276.    As a direct and proximate result of the knowing and substantial assistance provided by each Defendant to the breaches of the other Defendants, the Fraternity has suffered damages in excess of $75,000, to be proved at trial, including but not limited to: corruption of the Fraternity's democratic governance process; exposure to federal and state tax liability, interest, and penalties; depletion of corporate treasury through unauthorized expenditures; escalating insurance premiums, litigation costs, and settlement expenses; diversion of corporate resources for personal purposes; and the institutional harms flowing from leadership installed through a tainted election.

## COUNT IV
### Breach of Contract
*(Against all Defendants)*

277.    Plaintiff incorporates by reference each of the foregoing paragraphs regarding the Governing Documents and enforceable customs, Defendants' breaches, and resulting harm to the Fraternity as if fully set forth herein.

278.    The Fraternity's contractual governance framework, which constitutes a binding agreement between the Fraternity and its members, includes its written Governing Documents and those long-established customs that are uniform, reasonable, generally known, acquiesced in, and consistent with the Governing Documents. Among those enforceable customs is the Fraternity's decades-long rule that sitting and past General Presidents do not interfere in General Presidential elections.

279.    Defendants breached this contractual governance framework by, inter alia: (a) conducting the 2024 Constitutional Convention without the required suspension of amendment procedures, without the required thirty-day notice to chapters, and with only four days' actual notice; (b) violating the Election Handbook's prohibition on General Office staff campaigning by Defendant Johnson, at the direction or behest of Defendant Lonzer; (c) violating the Election Handbook's campaign-window rules and fair-process certification requirements by Defendant Lonzer; (d) violating the longstanding custom that sitting and past General Presidents do not interfere in General Presidential elections; (e) violating the four-year constitutional term limit for the General Counsel position, by Defendant Daryl Parks; (f) violating the Whistleblower Policy by retaliating against and failing to protect Plaintiff and other members who raised governance concerns; and (g) as to Defendant Daryl Parks, using the Fraternity's membership directory and email lists for his 2024 Florida Senate campaign in violation of the Fraternity's Governing Documents.

280.    As a direct and proximate result of Defendants' breaches of the Fraternity's governing framework, the Fraternity has suffered damages in excess of $75,000, to be proved at trial, including but not limited to: deprivation of a General President selected through a fair and rule-compliant process; failure to conduct required investigations in response to reported allegations; depletion of corporate treasury through expenditures undertaken in violation of the Constitution's amendment procedures; diversion of corporate resources in violation of the Fraternity's policies; and undermining of the contractual governance protections on which the Fraternity's membership relied. To the extent Plaintiff seeks declaratory or injunctive enforcement of the Governing Documents, the Fraternity has no adequate remedy at law.

## COUNT V
### Civil Conspiracy
*(Against all Defendants)*

281.   Plaintiff incorporates by reference each of the foregoing paragraphs regarding Defendants' misconduct, their agreement to engage in such misconduct, overt acts in furtherance of their agreement, and resulting harm to the Fraternity as if fully set forth herein.

282.   Beginning no later than February 2024 and continuing through the present, Defendants, together with non-party Past General Presidents Harry E. Johnson, Ward, and Mason, and John D. Ellis, Jr., agreed to conceal and forestall investigation of election interference, financial mismanagement, tax noncompliance, and other fiduciary breaches. In furtherance of that agreement, the co-conspirators: (a) caused the issuance of the October 28, 2024 McCaskill letter falsely representing that a meaningful "review" had been conducted; (b) appointed disbarred attorney John D. Ellis, Jr. as a sham investigator; (c) instructed the Board to ignore Plaintiff's demand based on the legally erroneous advice that "the law doesn't apply to us"; (d) conditioned any investigation on Plaintiff's abandonment of legal representation; and (e) proposed election-rule amendments designed to insulate fiduciaries from future accountability. Each act furthered the same common objective: to prevent the Fraternity's membership from learning the scope of Defendants' misconduct and to shield current and former fiduciaries from accountability.

283.   The September 2025 Tax Directive regarding subordinate-unit IRS filings was another overt act in furtherance of that same scheme. Rather than disclose the Fraternity's longstanding tax-compliance failure, quantify the exposure, investigate who knew of and failed to address it, or pursue a voluntary disclosure or other lawful remediation process, Defendants caused the Fraternity to direct subordinate units to file 990 forms without first addressing accumulated back-taxes and penalties. That directive perpetuated the concealment of the tax-compliance failure,

61

exposed subordinate-unit officers to potential personal liability, and furthered Defendants' objective of avoiding scrutiny for years of inaction.

284. The conspiracy also encompassed unauthorized acts beyond the scope of any Defendant's corporate authority, including without limitation (a) the recruitment of disbarred attorney John D. Ellis, Jr. to perform investigative legal work; (b) Defendant Daryl Parks's exercise of General Counsel powers after expiration of his constitutional term; and (c) the diversion of Fraternity resources for personal political campaigns.

285. Each Defendant acted with personal interests independent of and wholly separable from the Fraternity's interests, including: (a) Lonzer's and the Past General Presidents' interests in shielding their own prior misconduct from disclosure and accountability; (b) Metellus's interest in preserving the office he obtained through the tainted election; (c) Harvey's interest in retaining a General Counsel appointment he received as consideration for his endorsement; (d) Daryl Parks's interest in concealing his unauthorized use of Fraternity resources for his personal political campaign; (e) Howard's interest in avoiding scrutiny for the Southern Region deficit; (f) Netherly's interest in avoiding accountability for his failure to act on known allegations; and (g) Johnson's interest in retaining employment he would have lost absent Lonzer's protection.

286. Additionally, the conspiracy encompassed non-employee co-conspirators — Past General Presidents Ward, Mason, and Harry E. Johnson, Kevin Jenkins, Dr. U. Grant Baldwin and Dr. Travis Martin, and John D. Ellis, Jr. — who were not directors, officers, or employees of the Fraternity during the relevant period.

287. As a direct and proximate result of the conspiracy described herein, the Fraternity has suffered damages in excess of $75,000, to be proved at trial, including corruption of its governance process, delay in corrective action, exposure to tax liability, obstruction of

accountability, and institutional harm. All Defendants named in this Count are jointly and severally liable.

## COUNT VI
### Waste of Corporate Assets
*(Against Defendants Lonzer, Metellus, Daryl Parks, Harvey, and Howard)*

288.    Plaintiff incorporates by reference each of the foregoing paragraphs regarding Defendants Lonzer, Howard, Metellus, Daryl Parks, and Harvey's challenged expenditures and misconduct, lack of corporate benefit, and resulting harm to the Fraternity as if fully set forth herein.

289.    Corporate waste occurs when fiduciaries cause the corporation to expend assets for no consideration or for consideration so disproportionately small that no person of ordinary, sound business judgment would deem it worth what the corporation has paid.

290.    Lonzer, with Board acquiescence, caused the Fraternity to expend approximately $750,000 to convene the unauthorized 2024 Constitutional Convention—an expenditure that produced no legitimate corporate benefit because the Convention itself was procedurally void for failure to comply with the Constitution's notice requirements, and because the resulting amendments served Defendants' personal interests in self-insulation rather than the Fraternity's institutional interests.

291.    Howard, with the acquiescence of Lonzer and Metellus, caused the Fraternity to absorb the approximately $250,000 Southern Region operating deficit through a bailout from general corporate funds, without investigation of the cause of the deficit, without identification of those responsible, and without any corrective measures to prevent recurrence—an expenditure for which the Fraternity received no consideration.

292.    Metellus and Harvey caused the Fraternity to expend funds engaging John D. Ellis, Jr. as a purported independent investigator, notwithstanding Ellis's disbarment, producing no legitimate investigative work product and exposing the Fraternity to additional reputational and legal harm.

293.    Daryl Parks, while purporting to serve as General Counsel beyond his constitutional term limit, diverted Fraternity resources, communications channels, and membership directory to support his personal campaign for the Florida Senate, conferring no benefit on the Fraternity in exchange.

294.    As a direct and proximate result of Defendants' waste of corporate assets, the Fraternity has suffered damages in excess of $75,000, to be proved at trial, in an amount at minimum equal to the sum of the wasteful expenditures identified herein, for which the Fraternity received no legitimate corporate benefit. The Fraternity is entitled to restitution, surcharge against individual Defendants, and an accounting. To the extent equitable relief is sought, the Fraternity has no adequate remedy at law.

**COUNT VII**
**Unjust Enrichment**
*(In the alternative, against Defendants Lonzer, Metellus, Daryl Parks, Harvey, and Johnson)*

295.    Plaintiff incorporates by reference each of the foregoing paragraphs regarding Defendants Lonzer, Metellus, Daryl Parks, Harvey, and Johnson's retention of wrongfully obtained benefits and resulting harm to the Fraternity as if fully set forth herein.

296.    Defendant Daryl Parks accepted and retained compensation, benefits, and the prestige of the General Counsel position for more than three years beyond the four-year term limit imposed by the Fraternity's Bylaws. Retention of those benefits is inequitable because Daryl Parks

lacked any constitutional authority to occupy the position during the unauthorized extension and used the position to advance his personal political interests rather than the Fraternity's.

297. Harvey accepted and retained the General Counsel appointment as direct consideration for his public endorsement of Metellus during the Thirty-Seventh General Presidential Election—a quid pro quo arrangement that conferred a benefit on Harvey to which he was not entitled and which the Fraternity received no consideration for conferring.

298. Johnson, having engaged in conduct that the Election Committee Chairman acknowledged was sufficient to overturn the election, retained his compensated position as Assistant Executive Director through Lonzer's and Metellus's protection, conferring upon Johnson a continuing employment benefit to which he would not have been entitled but for the Defendants' breach of their oversight duties.

299. Lonzer and Metellus accepted and retained the office of General President and the powers, prerogatives, and privileges incident to that office through, respectively, an election influenced by their own misconduct and an election conducted under election rules that Defendants subverted. Retention of those benefits is inequitable in light of the manner in which they were obtained.

300. As a direct and proximate result of Defendants' unjust enrichment, the Fraternity is entitled to disgorgement of all benefits unjustly retained, the imposition of a constructive trust over those benefits, and an accounting of all compensation, benefits, and emoluments received by Defendants during the periods of wrongdoing identified herein.

## COUNT VIII
**Books and Records Inspection**
*(Against the Fraternity as Nominal Defendant)*

301.   Plaintiff incorporates by reference each of the foregoing paragraphs concerning Plaintiff's membership status, requested records, refusal, and need for relief as if fully set forth herein.

302.    As a member in good standing of the Fraternity, Plaintiff has the right, upon written demand stating a proper purpose, to examine and copy the Fraternity's books and records.

303.   A member of a corporation has the right, upon written demand stating a proper purpose, to examine the corporation's books and records of account, minutes, and list of members.

304.   Plaintiff has made repeated written demands for access to the following categories of records: (a) all election records, including membership data files transmitted to Merriman River Group, balloting records, Election Committee correspondence, and records of communications between the General Office and the Election Committee; and (b) the McCaskill "review" workpapers, including any memoranda, notes, or correspondence reflecting the substance or process of the purported review.

305.   Plaintiff's books and records demands were made in good faith and for a proper purpose: to investigate possible mismanagement and breaches of fiduciary duty, to verify the integrity of a corporate election in which serious irregularities had been alleged, to evaluate the merits of derivative claims, and to ensure that the Fraternity's governance complies with its governing documents and applicable law.

306.   Despite Plaintiff's demands, the Fraternity has refused to permit Plaintiff to examine the requested books and records. The Fraternity neither produced the requested records nor articulated any legitimate basis for declining to do so; instead, it failed and refused to respond

substantively to Plaintiff's demands and, in some instances, disregarded them altogether. At no point did the Fraternity identify any improper or unlawful purpose that would justify withholding the requested records.

307.    As a direct and proximate result of the Fraternity's refusal to produce the records described herein, Plaintiff has been unable to obtain records necessary to investigate possible mismanagement and breaches of fiduciary duty, verify the integrity of a corporate election in which serious irregularities had been alleged, evaluate the merits of derivative claims, and protect the Fraternity's interests.

308.    Plaintiff has no adequate remedy at law for the Fraternity's ongoing refusal to permit inspection, and is entitled to an order compelling production.

### COUNT IX
**Ultra Vires**
*(Against Defendants Lonzer, Metellus, Daryl Parks, Harvey, Johnson,*
*and the Fraternity as Nominal Defendant)*

309.    Plaintiff incorporates by reference each of the foregoing paragraphs regarding the Governing Documents, corporate powers and purposes, Defendants Lonzer, Metellus, Daryl Parks, Harvey's unauthorized acts, and the resulting harm to the Fraternity as if fully set forth herein.

310.    A corporation possesses only those powers conferred by its charter (Articles of Incorporation) and those reasonably necessary to carry out its chartered purposes. Acts of the corporation, or of its directors and officers purporting to act in its name, that are outside those chartered purposes or that are not reasonably necessary to effectuate them, or contravene mandatory law, are *ultra vires* and void.

311.    The Fraternity's Articles of Incorporation, dated April 2, 1912, fix the outer boundary of the corporation's lawful authority. They authorize the Fraternity to exist for the

"particular purpose and object . . . [of being] educational and for the mutual uplift of its members as expressed in its constitution, and in general to do and perform every lawful act and thing necessary or expedient to be done or performed for the efficient[] conducting of said society."

312.    Acts that are not educational, do not affect the mutual uplift of members, and are not reasonably necessary to the efficient conduct of the Fraternity exceed the powers conferred by the Articles and are *ultra vires*.

313.    Pursuant to the Fraternity's Constitution and Bylaws, the General Convention meets "biennially at such time and place, as the previous General Convention shall determine." Ex. 2, Constitution at 6. When there has been no decision by the preceding General Convention, then the Board has the authority to determine the time or place for holding the next General Convention. *Id.* at 7.

314.    Defendants caused the Fraternity to engage in, or themselves engaged in the Fraternity's name, the following acts, each of which exceeded the powers conferred by the Articles of Incorporation and were therefore *ultra vires*:

    a.  **The 2024 Chicago "Constitutional Convention" and resulting amendments.** Defendant Lonzer unexpectedly and suddenly convened a purported "Constitutional Convention" in July 2024. The Fraternity's Constitution and By-Laws make no mention of, let alone authorize, the holding of a "Constitutional Convention." The "Constitutional Convention" was held without any predicate suspension of the Constitution's amendment procedures and on four days' notice rather than the thirty days required by the Constitution. Convening a convention to alter the Fraternity's fundamental governance instruments—and expending approximately $750,000 of corporate funds to do so—without the corporate

authority required to call such a convention or to amend the governing documents was beyond the powers conferred on the Board and on the General President. The convention and the amendments purportedly adopted as a result are *ultra vires* and void *ab initio*.

b. **The September 2025 Tax Directive.** Defendants Metellus and Harvey caused the Board to direct the Fraternity's subordinate units to file 990 forms without first addressing decades of accumulated back-taxes and penalties or seeking a voluntary disclosure or compliance agreement with the IRS. A directive that knowingly perpetuates the Fraternity's tax-compliance failure, exposes the Fraternity and hundreds of subordinate-unit officers to civil and potential criminal tax liability, and forecloses lawful remediation is not a lawful exercise of corporate authority and serves no chartered purpose. The directive is *ultra vires* and should be set aside.

c. **Defendant Daryl Parks's exercise of General Counsel powers beyond his constitutional term, and his diversion of corporate resources to a personal political campaign.** The Constitution limits the General Counsel's term to four years. Const. art. IV, § 4.3. Daryl Parks continued to occupy and exercise the powers of General Counsel for more than three years beyond the constitutionally authorized term. Further, Daryl Parks abused his position by using the Fraternity's membership directory and email infrastructure to support his 2024 campaign for the Florida Senate. Acts taken by a person purporting to exercise corporate authority that has expired, and the use of corporate assets to advance a private political campaign that is unrelated to and inconsistent with the Fraternity's

69

educational and mutual-uplift purposes (and prohibited by § 501(c) restrictions on political-campaign intervention by tax-exempt organizations), are *ultra vires*.

d. **Official campaigning by persons and offices expressly denied campaign authority.** The Fraternity's Election Handbook prohibits General Office staff from assisting any candidate in an individual campaign. *See* Election Handbook at 7. The Fraternity also had a long-continued, unbroken, and unopposed custom that sitting and past General Presidents do not use the authority, prestige, or machinery of their offices to interfere in General Presidential elections. Defendants' use of official corporate office, staff authority, letterhead, membership data, and General Office communications channels to campaign for Defendant Metellus and against Plaintiff when the governing instruments and binding custom withheld any such authority. Those acts were beyond the delegated authority of General Office staff and sitting or past General Presidents, and they are voidable as ultra vires to the extent they were undertaken in the Fraternity's name or with Fraternity resources.

315. The acts challenged in this Count have not been ratified by any lawful exercise of corporate authority and are not capable of ratification because they exceed the powers conferred by the Articles of Incorporation, contravene mandatory law, or both.

316. As a direct and proximate result of the *ultra vires* acts described above, the Fraternity has been deprived of approximately $750,000 expended on the unauthorized 2024 Constitutional Convention; subjected to substantial federal and state tax exposure (with attendant interest and penalties) flowing from the September 2025 Tax Directive; deprived of the value of the General Counsel position during the period Daryl Parks occupied it without authority and of the Fraternity resources he diverted to his personal political campaign; and the corruption of the

70

Fraternity's corporate election machinery through prohibited campaigning activity during the Thirty-Seventh Presidential election cycle.

317.    Plaintiff, derivatively on behalf of the Fraternity, is entitled to: (a) a declaration that each of the acts identified above is *ultra vires* and void *ab initio*; (b) an injunction prohibiting Defendants and their successors from giving further effect to those acts and from undertaking similar acts in the future; (c) restitution to the Fraternity of all funds expended in connection with the unauthorized 2024 Constitutional Convention and Daryl Parks's diversion of corporate resources; (d) an order setting aside the September 2025 Tax Directive and requiring the Board to develop, with qualified outside counsel, a lawful plan to remediate the Fraternity's and its subordinate units' tax exposure; and (e) such other declaratory, injunctive, and equitable relief as the Court deems just.

318.    Plaintiff, on behalf of the Fraternity, has no adequate remedy at law because monetary damages alone cannot restore lawful governance, undo unauthorized corporate acts, or prevent recurrence.

### COUNT X
**Declaratory Judgment**
*(Against Defendants Lonzer, Metellus, Daryl Parks, Harvey,
and the Fraternity as Nominal Defendant)*

319.    Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

320.    This is an actual and justiciable controversy because the parties dispute the validity, legality, and enforceability of actions taken by Defendants in their official capacities as Directors, Officers, employees, agents, and fiduciaries of the Fraternity.

321.    Declaratory relief is necessary and appropriate because Defendants' alleged conduct has created continuing uncertainty regarding the validity of the Fraternity's leadership,

the legality of its governance instruments, the enforceability of its election rules, the lawfulness of its tax directives, the existence, scope, and allocation of unresolved tax liabilities, the authority of conflicted counsel, and the Fraternity's ability to investigate and remedy fiduciary misconduct without court intervention.

322.    Declaratory relief will serve a useful purpose by resolving the legal status of the challenged elections, governing-document provisions, tax directives, counsel appointments, and election-rule amendments, and by clarifying the parties' rights, duties, and obligations going forward.

323.    Plaintiff has no adequate remedy at law for the uncertainty and continuing governance harms alleged in this count. Monetary relief alone would not restore the integrity of the Fraternity's democratic process, resolve the validity of disputed governance actions, determine or remediate the Fraternity's and subordinate units' historical tax liabilities, ensure lawful tax compliance, cure conflicted legal representation, or prevent continued enforcement of unlawful or ultra vires rules and directives.

324.    Accordingly, Plaintiff respectfully requests that the Court enter judgment declaring that (a) the September 2025 Tax Directive is unlawful and void, and that the Fraternity's unresolved federal and state tax liability exposure must be independently investigated, quantified, disclosed, and remediated before subordinate units are directed to make tax filings or represent tax compliance; (b) the Thirty-Seventh General Presidential Election is void and that a new election must be conducted; (c) Defendant Daryl Parks's access to and use of the Fraternity's membership email directory, telephone directory, membership lists, or other membership data for his Florida Senate campaign or related political campaign activities was improper, unauthorized, ultra vires,

and contrary to the Fraternity's tax-exempt and corporate purposes; and (d) the Constitutional and By-Laws amendments adopted at the 2024 Constitutional Convention are ultra vires and void.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, derivatively on behalf of Alpha Phi Alpha Fraternity, Incorporated, respectfully requests that this Court enter judgment in favor of the Fraternity and against Defendants, and grant the following relief:

(a) Declare unlawful, ultra vires, and void the September 2025 Tax Directive requiring subordinate units to file IRS Form 990s without first addressing accumulated back-taxes, penalties, tax-exempt status, group-exemption issues, voluntary-disclosure options, and related compliance exposure;

(b) Order the Board, under the supervision of qualified independent tax counsel and other appropriate outside professionals, to develop and implement a lawful tax-compliance and remediation plan for the Fraternity and its subordinate units, including an assessment of tax exposure, corrective filings, voluntary-disclosure options, and procedures to ensure future compliance;

(c) Order the Fraternity to implement policies, procedures, reporting channels, and independent investigative protocols to address hazing, sexually predatory conduct, retaliation, and other member-safety risks, including protocols for receiving, investigating, documenting, and reporting allegations involving Directors, Officers, members, employees, and volunteers;

(d) Order an independent investigation by qualified outside counsel or other qualified independent professionals, free from conflicts of interest, into the Director and Officer misconduct alleged in this Complaint, and require the investigator to prepare a written report of findings and recommendations, with an appropriate version disclosed to the membership subject to any necessary redactions or protective order for privileged, confidential, or sensitive third-party information;

(e) Order that Plaintiff and his designated representatives be granted access to the books and records described in Count VIII, as required by 805 ILCS 105/107.75;

(f) Declare the Thirty-Seventh General Presidential Election void and order a new election conducted under independent oversight, with safeguards sufficient to ensure compliance with the Fraternity's governing documents, binding customs, and applicable law;

(g) Enjoin Defendants, their agents, and any persons acting in concert with them from interfering in Fraternity elections, misusing Fraternity resources or

communications channels for campaign activity, retaliating against Plaintiff or witnesses, or retaliating against any member, employee, volunteer, or officer who raises governance, compliance, election-integrity, hazing, sexual-misconduct, financial, or tax-compliance concerns;

(h)    Declare the amendments to the Constitution and By-Laws purportedly adopted at the 2024 Chicago Constitutional Convention ultra vires and void ab initio, and enjoin Defendants and the Fraternity from giving further effect to those amendments unless and until they are adopted through procedures consistent with the Fraternity's governing documents and applicable law;

(i)    Declare the revised Policies, Procedures, and Elections Instructions Manual adopted by the Metellus Administration — scheduled to take effect in September 2026 — void ab initio, and permanently enjoin Defendants from implementing or enforcing those amendments in any forthcoming election;

(j)    Declare that Defendant Daryl Parks's use of Fraternity membership data, contact information, communications infrastructure, or other Fraternity resources for his personal political campaign was unauthorized and improper, and order restitution, disgorgement, accounting, and any other equitable relief necessary to restore the Fraternity for any benefit obtained or expense incurred from that misuse;

(k)    Order compensatory damages to the Fraternity in an amount in excess of $75,000, to be proved at trial, including damages arising from treasury depletion, unauthorized expenditures, regional operating deficits, tax exposure, increased insurance premiums, litigation costs, settlement expenses, misuse of corporate resources, and harm to the Fraternity's governance, reputation, and institutional capacity;

(l)    Order disgorgement of compensation, benefits, fees, emoluments, and other benefits unjustly retained by Defendants during periods in which they breached fiduciary duties, acted disloyally, or obtained benefits through misuse of Fraternity office or assets;

(m)    Impose a constructive trust over benefits obtained through Defendants' misconduct, require an accounting from each Defendant of compensation and benefits received during the relevant periods, and impose a surcharge against individual Defendants for financial harm attributable to their conduct;

(n)    Award compensatory damages to the Fraternity for all documented harms, including restitution for the approximately $750,000 depleted by the unauthorized 2024 Constitutional Convention and the approximately $250,000 Southern Region deficit; order disgorgement of all benefits, compensation, and emoluments unjustly retained by Defendants during the periods of wrongdoing identified herein; impose a constructive trust over all such unjustly retained benefits; require an accounting from each Defendant of all such benefits; impose a surcharge against individual

74

Defendants in the amount of the specific financial harm attributable to their individual conduct; and order indemnification of subordinate units for tax exposure arising from the Board's failure to address IRS compliance;

(o)     Require reform of the Fraternity's Grievance and Discipline procedures to ensure that allegations involving Directors, Officers, General Counsel, executive staff, or other senior leaders are investigated by independent persons free from conflicts of interest, with written findings and transparent reporting to the Board and membership as appropriate;

(p)     Order appropriate personnel and structural relief, including removal or suspension of Defendants from positions of authority, barring Defendants from serving in election-administration, disciplinary, legal, financial, compliance, or governance roles pending further order of the Court, and initiation of independent disciplinary proceedings consistent with the Fraternity's governing documents and applicable law;

(q)     Appoint a court monitor or special master, if necessary, to oversee implementation of the Court's orders, including tax-compliance remediation, investigation, governance reforms, books-and-records production, anti-retaliation protections, and the integrity of any new election;

(r)     Award pre-judgment and post-judgment interest at the maximum rate permitted by law on all monetary recovery;

(s)     Award Plaintiff reasonable attorneys' fees and costs incurred in bringing and prosecuting this derivative action; and

(t)     Grant such other and further legal and equitable relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Respectfully Submitted,

WOMBLE BOND DICKINSON (US) LLP


/s/ *Jasmine G. Chalashtori*
Jasmine G. Chalashtori (Bar No. 20179)
2001 K Street NW, Suite 400 South
Washington, DC 20006
(202) 857-4410
Jasmine.Chalashtori@wbd-us.com

James E. Connelly (*pro hac vice* pending)
1331 Spring St. NW, Suite 1400 Atlanta,
GA 30309
(404) 888-7496
James.Connelly@wbd-us.com

Andre M. Davis (D. Md. reactivation filed)
Chukwukpee Nzegwu (Bar No. 21730)
100 Light St, 26th floor
Baltimore, MD 21202
(410) 545-5861
Chukwukpee.Nzegwu@wbd-us.com

*Counsel for Plaintiff*

76

**VERIFICATION**

I, Gregory S. Parks, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the above-captioned action and have authorized the filing of this Verified Derivative Complaint. I have reviewed the allegations made in this Complaint. As to those allegations based upon my personal knowledge, I believe them to be true. As to those allegations not based upon my personal knowledge, I rely upon information provided to me, documents reviewed, and the investigation of my counsel, and I believe them to be true.

Dated: June 18, 2026

Gregory S. Parks, J.D., Ph.D.